

United States District Court
Southern District of Texas
FILED

FEB 2 2 2001

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JUSTIN OAKERSON | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 99 - 197 |
| CITY OF BROWNSVILLE, | § | |
| ARTURO RODRIGUEZ and | § | |
| CARLOS RUBINSTEIN | § | (JURY REQUESTED) |

---

## DEFENDANTS' SECOND AMENDED OBJECTION TO ADMISSION
## OF IMPROPER CHARACTER EVIDENCE

---

TO THE HONORABLE U. S. DISTRICT COURT:

COME NOW **CITY OF BROWNSVILLE, TEXAS, ARTURO RODRIGUEZ,** and

**CARLOS RUBINSTEIN,** Defendants in the above-entitled and numbered cause, and hereby

file this their Objection to Admission of Improper Character Evidence, pursuant to Federal

Rule of Evidence 404(b), pertaining to the proffer of evidence of Joel Ferrell's Termination

and Related Evidence, and for such Objection would respectfully show unto the Court the

following:

### I.

### SUMMARY OF OBJECTION

Plaintiff alleges in this lawsuit that he was terminated in violation of his First

Amendment right to freedom of association because of his membership in, and organizing

CMPDF - www.fineio.com

efforts on behalf, of the Brownsville Professional Fire Fighters' Association. Plaintiff seeks to elicit testimony relating to the prior termination of Joel Ferrell over 18 months before Plaintiff Oakerson failed his probationary period on June 22, 1999. Plaintiff also seeks to introduce evidence of disciplinary evaluation of three other employees, Sam Ortega, Norma Ferrell and Reynaldo Rosales. Defendants deny that either Plaintiff Ferrell or Mr. Oakerson were terminated for any constitutionally impermissible reasons, and assert that disciplinary determination on the three other employees was reasonable in light of the facts. Plaintiff also seeks to introduce the testimony of witness Bryan Chandler, Reynaldo Gil, Reynaldo Rosales, Fermin Casares, Carlos Elizondo, Sam Ortega and Arturo Rodriguez to an alleged anti-union bias of Defendant Rodriguez. Although Plaintiff did not identify the dates of any alleged comments by Defendant Rodriguez, Defendants believe Plaintiff alleges these comments were allegedly made in mid-1997, over 1½ years before any action was taken against Plaintiff Oakerson.

Defendants deny that any Defendant made any of the anti-union comments attributed to him. Plaintiff Ferrell was terminated because of his misconduct in handling an EMS run, combined with his history of medical protocol infractions. *See* Exhibit "A," Affidavit of Arturo Rodriguez (hereinafter Rodriguez Affidavit), the original of which is attached as Exhibit "C," to Defendants' Brief in Support of Admission of Medical Records. Oakerson, on the other hand, applied for and received a promotion to the position of Training Officer on a probationary basis, but he was discharged when he did not successfully complete his probationary period. Exhibit "B," Deposition of Arturo Rodriguez (hereinafter Rodriguez Depo), P.174, LL.3-12, P.175, L.1 – P.176, L.7, P.191, LL.14-17. Discussion of disciplinary measures taken or not taken against other employees is prohibited under the Texas

Open Records Act and pursuant to the employees' rights to privacy. In addition, Plaintiff does not submit any argument as to why Mr. Ferrell's termination or the disciplinary evaluations of the other employees should be admissible in the present action, based on the facts alleged and Plaintiff's Original Complaint. Although such evidence *can* be admissible, Plaintiff has not established why it ***should*** be admissible in this case under Rule 404(b).

Evidence of facts relating to Joel Ferrell's termination, as well as the seven (7) witnesses testimony of Rodriguez statements in 1997, are not admissible under Federal Rule of Evidence 404(b), because such evidence would not be calculated to show any motive or intent of Defendants Rodriguez, Rubinstein or the City of Brownsville when Plaintiff Oakerson failed to successfully complete his probationary period over eighteen (18) months *later*. The pertinent inquiry is Defendants Rodriguez', Rubinstein's or the City of Brownsville's state of mind at the time of ***Oakerson's*** termination, not any overall "character" of Defendants. Particularly because of the considerable amount of time between the two terminations (18 months), combined with Defendants' denial of any anti-union animus, Plaintiff has failed to establish any basis on which Rule 404(b) would authorize the admission of this evidence. Similarly, evidence on the disciplinary evaluations of Norma Ferrell, Sam Ortega and Reynaldo Rosales would have no bearing on the evaluation of Mr. Oakerson, and such employees' privacy rights would prevent discussion of their disciplinary evaluations.

In addition, if the evidence of Mr. Ferrell's termination is admitted into evidence, Defendants would have the additional burden of disproving his allegations, and essentially trying Ferrell's entire lawsuit, in order to rebut that additional allegation of anti-union animus. This would further unnecessarily complicate this case because Ferrell was a regular employee, not simply a probationary employee. Defendants would have to provide additional evidence on

the separate standard applicable to regular employees, along with a separate set of employment policies, in order to establish why Mr. Ferrell was terminated. Although Plaintiff would only seek to introduce allegations that Ferrell and Oakerson both *allege* that the reason for their termination was their union activity, in order to rebut this allegation Defendants would be placed in the position of having to produce considerable additional evidence that Mr. Ferrell's termination was proper. Similarly, Defendants would be saddled with the additional burden of justifying the disciplinary measures taken or not taken against Sam Ortega, Norma Ferrell and Reynaldo Rosales, in violation of other privacy rights.

Finally, if the Court allows Ferrell to testify to an alleged impermissible intent in terminating him because of his union affiliation, Defendants will need to engage in considerable additional discovery relating to all union members, in order to establish that neither the City nor Mr. Rodriguez took action against any of these other employees, notwithstanding their union affiliation. This would be necessary to establish that in fact Oakerson's claims are an isolated allegation, considering no adverse action was taken against any other union members based on their affiliation.

## II.

## FEDERAL RULE OF EVIDENCE 404(b) STANDARD

Federal Rule of Evidence 404(b) provides in pertinent part as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . .

"The reason for [Rule 404(b)] is that such character evidence is of slight probative value and tends to distract the trier of fact from the main question of what actually happened on a particular occasion." *Jones v. Southern Pacific R.R.*, 962 F.2d 447, 449 (5th Cir. 1992).

Pursuant to *United States v. Beechum*, Rule 404(b) mandates a two-part analysis: first, the Court must evaluate whether the proffered evidence fits within one of the exceptions listed in the rule and, second, the Court should balance the probative value of the evidence against the likelihood of undue prejudice, equivalent to the analysis under Rule 403. 582 F.2d 898, 911-15 (5th Cir. 1978). *See also*, *U.S. v. Greenwood*, 974 F.2d 1449, 1462 n.8 (5th Cir. 1982). A necessary part of the first element of relevancy involves an analysis of whether the Defendants actually committed the alleged extraneous offense. "Obviously, the line of reasoning that deems an extrinsic offense relevant to the issue of intent is valid only if an offense was in fact committed and the defendant in fact committed it." *U.S. v. Beechum*, 582 F.2d at 912. In addition, evidence describing acts or "wrongs" which do not relate to Plaintiff's actual work environment should be excluded under Rule 404(b). *See Swanson v. General Services Admin.*, 110 F.3d 1180, 1190 (5th Cir. 1997). *See also Kelly v. Bowing Petroleum Services, Inc.*, 61 F.3d 350, 357-58 (5th Cir. 1995). The admissibility of evidence regarding other alleged acts or wrongs will also turn on the similarity in time and manner of the conduct complained of by the Plaintiff and the conduct involved in the other acts or wrongs. *See Swanson v. General Services Admin.*, 110 F.3d at 1190; *Kelly v. Bowing Petroleum Services, Inc.*, 61 F.3d at 357-58.

## III.

## EVIDENCE OF FERRELL'S TERMINATION
## IS NOT ADMISSIBLE UNDER RULE 404(b)

Plaintiff seeks to admit into evidence acts and statements relating to Joel Ferrell's termination, which occurred over 18 months before Plaintiff Oakerson's termination. Exhibit "B," Rodriguez Depo, P.170, L.23 – P.171, L.22; Exhibit "C," Affidavit of Justin Oakerson, (hereinafter Oakerson Affidavit), PP.2-3, Para. 9, the original of which is attached as Exhibit 4 of Plaintiff's Appendix of Summary Judgment Evidence, submitted with Plaintiff's Memorandum in Support of Plaintiff's Opposition to Defendants Rodriguez' and Rubinstein's Motion for Summary Judgment (hereinafter Plaintiff's Response). Mr. Ferrell was terminated after he failed to follow proper medical protocols. Mr. Ferrell claims the reason for his termination was his union affiliation. Plaintiff would have this Court consider alleged acts and statements occurring before he failed his probationary period on the theory that prior acts or statements would indicate Defendants were more likely or more disposed to have previously terminated Plaintiff because of an anti-union animus.

Although Plaintiff argues that numerous cases authorize the admission of evidence of other acts to establish a Defendant's motive or intent, he has not argued or submitted to the Court any case that would establish how evidence of *Mr. Ferrell's* termination would establish the motive or intent of Defendants Rodriguez, Rubinstein or the City of Brownsville *in terminating Plaintiff Oakerson*. Plaintiff argues only that "intent may be inferred" by evidence of treatment of other parties, but he has provided no argument to establish how evidence of Mr. Ferrell's termination would justify an inferred intent of Defendants in terminating Mr. Oakerson. Although there are circumstances in which extrinsic evidence may

be used to establish intent, Plaintiff has not established how this is one of those circumstances. Plaintiff has not applied the Rule 404 (b) analysis to the facts and circumstances of this case, and evidence of Mr. Oakerson's termination should therefore not be admitted into evidence.

Rule 404(b) specifically provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Nor would any allegations relating to Mr. Ferrell's "termination" establish any "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" affecting Plaintiff Oakerson's termination over 18 months later. Plaintiff's only basis for asserting the admissibility of Mr. Ferrell's allegations are specifically to attribute an anti-union intent or "character" to Defendants, to show that their anti-union animus was part of their character. Such a purpose is not permitted by Rule 404(b). Any evidence regarding Mr. Ferrell's termination over 18 months *before* Plaintiff's termination has no bearing on whether these Defendants had knowledge of Plaintiff Oakerson's union affiliation or considered his union activities over 18 months later.

Plaintiff would argue that the consistent thread in his and Mr. Ferrell's terminations is their activities in soliciting members for the EMS section of the Fire Fighters Association, claiming that it was a substantial or motivating factor in Defendants Rodriguez' and Rubinstein's decisions to terminate his employment. The key issue in establishing this element of Plaintiff's prima facie case, however, is whether Defendants Rodriguez, Rubinstein or the City of Brownsville actually considered Oakerson's associational activities in terminating *Oakerson's* employment. Plaintiff is requesting that this court consider evidence pertaining to Defendant Rodriguez' and the City's conduct relating to Mr. Ferrell's termination over 18 months before Plaintiff's pre-termination hearing to establish that these two (2) defendants had

v:\fp\motions\99-173.Ds' 2nd Am. Obj. to Evidence

a discriminatory intent in firing Plaintiff. Evidence of an allegedly improper termination over 18 months *before* Plaintiff's termination could not assist a trier of fact in determining either of these Defendants' intents or states of mind 18 months after Plaintiff failed his probation, however.

In addition, the termination of Mr. Ferrell is too remote in time from the termination of Plaintiff to have any relevance to the reasons for Plaintiff's failure of probation. Ferrell was terminated in November 1997, and Mr. Oakerson was not terminated until June 22, 1999, over 18 months after Ferrell. Exhibit "B," Rodriguez Depo, P.170, L.23 – P.171, L.22; Exhibit "C," Oakerson Affidavit, PP.2-3, Para. 9. Where a subsequent act occurs shortly after the act about which Plaintiff complains, and if the subsequent act would be admissible for some other purpose allowed by Rule 404(b), it may be relevant. *See Dial v. Travelers Indem. Co.,* 780 F.2d 520, 523-24 (5th Cir. 1986). Where over a year has lapsed between the complained of action and a subsequent act, admissibility of the subsequent act is much more questionable. "[T]he expiration of the considerable length of time [one year] in this case depleted the extrinsic offense of any relevance which could have outweighed the peril of jury prejudice." *United States v. Jimenez*, 613 F.2d 1373, 1376 (5th Cir. 1980).

A concomitant part of the analysis for determining whether the alleged extrinsic offense is relevant is the determination of whether the extrinsic act actually occurred. "[T]he line of reasoning that deems an extrinsic offense relevant to the issue of intent is valid only if an offense was in fact committed and the Defendant in fact committed it. *Dial v. Travelers Indem. Co.,* 780 F.2d at 523; *U.S. v. Beechum*, 582 F.2d at 912. Therefore, as a predicate to determining the admissibility of evidence of Mr. Ferrell's allegation that he was terminated because of his union affiliation, the Court would need to first make a threshold determination

of whether in fact Plaintiff has submitted sufficient evidence consistent with Rule 104(b) that Mr. *Ferrell* was in fact terminated because of his union actions, a claim which Defendants strongly dispute. *See generally*, *U.S. v. Beechum*, 582 F.2d at 912.

Federal Rule of Evidence 104(b) requires Plaintiff to provide a "preponderance of proof" of the facts he alleges. "The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the [Federal Rule of Evidence] have been afforded due consideration." *Bourjaily v. U.S.* 483 U.S. 171, 175, 107 S.Ct. 2775, 2779 (1987). Otherwise, evidence of Plaintiff's bald allegation would serve no purpose other than to inflame the passions of the jury to conclude that Plaintiff's allegations are in fact correct based on, or consistent with, the allegations of Mr. Oakerson.

The only evidence of Defendants' alleged anti-union actions offered by Plaintiff has been the termination of Mr. Ferrell. Exhibit "C," Oakerson Affidavit, PP.2-3, Para. 9. Although Plaintiff refers to "a number of employees" who were union members, including two who allegedly spoke directly to Defendant Rodriguez about union matters, he points this Court to no evidence that any retaliatory action was ever taken against any other employees, including the two who allegedly spoke to Defendant Rodriguez. *See* Exhibit "D," Affidavit of Fermin Cazares (hereinafter Cazares Affidavit), the original of which is attached as Exhibit 6 to Plaintiff's Response; Exhibit "E," Affidavit of Alfredo Christman (hereinafter Christman Affidavit), the original of which is attached as Exhibit 5 to Plaintiff's Response. Interestingly, even though Plaintiff's evidence indicates these Defendants have long known that Alfredo Christman was the BFFA Union President, with whom these Defendants have had several meetings and conversations, no evidence was submitted, nor was any allegation made, that Mr.

Christman *ever* suffered *any* form of employment discrimination as a result of his union membership or presidency.  Exhibit "E," Christman Affidavit.  Any testimony relating to Mr. Ferrell's termination, therefore, should not be admissible herein.

IV.

**EVIDENCE OF DISCIPLINARY ACTION RELATING TO
OTHER EMPLOYEES IS NOT ADMISSIBLE**

Plaintiff also seeks to admit into evidence testimony relating to Defendant Arturo Rodriguez' employment evaluations and alleged failure to take disciplinary action against Sam Ortega, Norma Ferrell, and Reynaldo Rosales.  Although Plaintiff has not yet identified the full extent of such alleged testimony, other than to allege that Sam Ortega and Norma Ferrell engaged "in the same contact as Mr. Ferrell," and that Mr. Rosales "was equally responsible for the actions for which Plaintiff was discharged," he has indicated an intent to question Defendant Rodriguez on the basis for his disciplinary decisions.  This Court has previously indicated in its Order of November 20, 2000, that Defendants would be prohibited from introducing into evidence and discussing Plaintiff Ferrell's prior misconduct evidenced through medical records.  Defendants had previously sought to admit those records to establish a history of Plaintiff failing to follow established medical protocols, for which he had been previously counseled.  Although Plaintiff had been previously counseled for numerous medical protocol infractions, which Defendants are now prohibited from discussing at trial, Plaintiff would seek to admit evidence of the counseling of other employees to establish that they were given some form of special treatment, and he was not.  It would seem patently unfair and contrary to the intent of the Rules of Evidence that Plaintiff would be allowed to provide evidence that other employees were "given a break," while Defendants are prevented from

providing evidence of prior instances in which Plaintiff was "given a break." It would also appear to be contrary to the intent of this Court's Order of November 20, 2000.

As with the evaluation of the *Oakerson's* evidence this Court would also have to first determine whether evidence relating to the disciplinary action considered and taken against Sam Ortega, Norma Ferrell and Reynaldo Rosales is relevant to the present action, including evaluating whether the conduct alleged by Plaintiff Ferrell actually occurred by these other three employees. *See Dial v. Travelers Indem. Co.*, 780 F.2d at 523; *U.S. v. Beechu*m, 582 F.2d at 912. In order to make that determination, however, the Court would need to delve into the stacks of each of the incidents relating to each of those witnesses, which are personnel matters protected by the Freedom of Information Act, the Texas Open Records Act, and applicable law applying to privacy *considerations. 5 U.S.C. §552(b)(6); United States Dept of Defense v. Federal Labor Relations Authority*, 510 U.S. 487, 496-97, 114 S.Ct. 1006, 1013, 127 L.Ed.2d 325 (1994); Tex. Gov't Code §552.102. In order to justify its employment and disciplinary decisions relating to each of the other three witnesses, Defendants would necessarily have to submit evidence relating to the employees' actions, which are personnel matters protected from disclosure. Plaintiff seeks to establish that the Defendants' actions relating to him were pretextual and that the City did not have sufficient reason to take action against him. Whether the City took action against other employees for unrelated matters, involving unrelated incidents, would not affect whether the Defendants had sufficient basis to take action against Plaintiff in the present action. Evidence relating to the disciplinary measures taken or not taken against other employees, therefore, is not admissible in this action.

## V.

## ANY PROBATIVE VALUE OF FERRELL'S TESTIMONY IS OUTWEIGHED BY THE LIKELIHOOD OF UNFAIR PREJUDICE, CONFUSION OF THE ISSUES, MISLEADING OF THE JURY AND OTHER FACTORS

The second element of this analysis, whether the probative value is substantially outweighed by any undue prejudice, consistent with Rule 403, further dictates that the allegations of Mr. Ferrell's termination are not admissible, particularly considering the different employment evaluations applicable to Plaintiff, a probationary employee, and Mr. Ferrell, a non-probationary employee. Federal Rule of Evidence 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

At the time of his termination, Ferrell was employed as a paramedic making him a non-probationary employee. See Exhibit "F," Affidavit of Joel Ferrell (hereinafter Ferrell Affidavit), P.1, Para.2, the original of which is attached as Exhibit 3 to Plaintiff's Response. Justin Oakerson, on the other hand, was a probationary Training Officer (supervisor) at the time of his termination. See Exhibit "C," Oakerson Affidavit, PP.2-3, Para.9. Ferrell was terminated for misconduct involving the mishandling of a patient after a pre-termination hearing, which he was allowed to and did appeal, but he was not offered any further employment. See Rodriguez Deposition, P.111, L.12 - P.116, L.17, P.126, L.2 - P.128, L.24, P.170, L.15 - P.171, L.6; Exhibit "G," Deposition of Carlos Rubinstein (hereinafter Rubinstein Depo), P.36, L.6 - P.37, L.15, P.63, L.9 - P.64, L.10. Plaintiff Oakerson was terminated after he did not successfully complete his probation as the Training Officer, but he was offered the opportunity to reapply at Brownsville EMS for a position as a paramedic.

Exhibit "C," Oakerson Affidavit, PP.2-3, Para.9; Exhibit "B," Rodriguez Depo, P.191, L.14 - P.195, L.22.   The only similarity between the two cases is that both Plaintiffs allege the *reason* for their termination was their union activity.   Plaintiff submits *no independent evidence* to establish such allegation, however, other than his bald claim.   The same is true of Mr. Ferrell's allegations.   Any evidence pertaining to Mr. Ferrell's termination therefore has little or no probative value in Plaintiff's case, particularly considering the delay between the two claims, and the potential for prejudice from such evidence in the jury's synergistic assessment of the two allegations.

The potential prejudice to Defendants, on the other hand, may be considerable. Plaintiff would urge that the fact of two union terminations establishes a pattern or evidence of Defendants' character that proves their intent, a sort of "where there's smoke, there's fire" argument.   Defendants would then be saddled with the burden of disproving the allegations of Mr. Ferrell, raised over 18 months *before* Plaintiff 's termination, to establish their state of mind *relating* to Plaintiff's termination.   Defendant would have to marshal all the evidence relevant for Mr. Ferrell's lawsuit to be able to defend Mr. Oakerson's lawsuit, effectively doubling the amount of Defendant's evidence, preparation, and legal and factual issues in order to prepare for and defend this action.   The result of this additional evidence could be the jury's confusion of the issues they are to decide, or they could be misled into finding liability on the basis of Mr. Ferrell's allegations, rather than on Mr. Oakerson's.

Similarly, any evidence of disciplinary action taken or not taken against Sam Ortega, Norma Ferrell and Reynaldo Rosales would not be probative of the issue of action taken against Plaintiff Ferrell.   Plaintiff has not even identified specifically the alleged infractions engaged in by Sam Ortega or Norma Ferrell, other than to claim that Defendant Rodriguez

witnessed these two employees engage in the "same conduct," as himself. He has not identified the time or any specifics relating to any such alleged conduct, nor has he identified any specifics on the actual conduct allegedly engaged in, whether such action was verifiably or verified, or any disciplinary action taken or considered against these employees. In addition, although Reynaldo Rosales was involved in the incident for which Plaintiff was terminated, Plaintiff Ferrell was the Paramedic in charge of that EMS run, and Mr. Rosales was merely an EMT, who was required to follow the decisions of Mr. Ferrell. As a subordinate, any disciplinary action considered or taken against Mr. Rosales would include a different evaluation, since any decisions he would have made during that run would have to be subject to the final decision by Mr. Ferrell. The risks exist, however, that a jury may want to evaluate the two EMS personnel in the same manner, however, thereby subjecting Defendants to a risk of prejudice, where the information sought to be introduced by Plaintiff has little or no probative value.

A jury may also be more inclined to believe Plaintiff's allegations based on a numerical analysis, rather than on a factual evaluation. If the jury has to evaluate only the evidence relating to the Plaintiff's termination, they can make a determination based on the evidence presented. If instead they hear evidence of another *allegation* that someone else was later terminated for the same reason, or that other employees under other circumstances were not terminated, they may be more inclined to conclude that because *two or more* people are making the same allegation, "something must have happened," or two Plaintiffs are more likely to be correct in their allegations than just one.

Accordingly, because the evidence of Mr. Ferrell's termination, over 18 months before Plaintiff's termination, and the disciplinary evaluations of Sam Ortega, Norma Ferrell and

.

Reynaldo Rosales, are not relevant, are too removed in time and circumstances, are without sufficient basis in fact, and are submitted only to establish Defendants' character, and because any probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, such evidence is not admissible under Federal Rule of Evidence 404(b).

## VI.

### NEED FOR ADDITIONAL EVIDENCE AND TESTIMONY IF OAKERSON EVIDENCE IS ADMISSIBLE, ALL OF WHICH MAY RESULT IN UNDUE DELAY OR WASTE OF TIME

If the Court should rule that Ferrell's testimony relating to his termination is admissible to show the motive or intent of Defendants Rodriguez, Rubinstein or the City of Brownsville, Defendants would need to similarly submit additional evidence from other union members to establish that no action was taken against them for their union affiliation. Although Defendant City of Brownsville has previously requested this information from Plaintiff, Plaintiff curiously objected to the production of this information as not relevant, nor reasonably calculated to lead to the discovery of relevant information, and did not provide the requested information. *See* Exhibit "H," Plaintiff's Objections and Responses to Defendant City of Brownsville's Interrogatories and Requests for Production, P.10, Objection and Answer to Interrogatory No. 11. This was notwithstanding Defendants' specific representation that

.    [f]or purposes of description as to the need for this information for discovery purposes, this information is necessary to determine whether other Brownsville "Association" members have been promoted, demoted, or experienced any other favorable or adverse treatment in their employment, and to evaluate the effects of dues or fees on potential members' decisions to enroll, or not enroll, in the assocation.

*Id.* P.10, Interrogatory No. 11.

In the event that the Court would grant Plaintiff's request to admit evidence of Mr. Ferrell's termination, or of the discipline of Sam Ortega, Norma Ferrell or Reynaldo Rosales,

Defendants would also need leave to compel Plaintiff to fully respond to Defendants' Interrogatory request, in order to establish the facts surrounding all other EMS employees who were members of the union who *did not* suffer any alleged retaliation for their membership. If Plaintiff is to be allowed to provide evidence of an isolated instance in which another union member was terminated, or non-union members were not, Defendants should similarly be allowed leave to provide evidence of all the other union members who were not terminated, and against whom no retaliatory action was ever taken. The testimony of each of the other members who were not terminated or retaliated against would have as much relevance as the testimony of Mr. Ferrell. Plaintiff's selective discovery disclosures do not appear to be directed towards the admission of all evidence that would reflect the City's or Mr. Rodriguez' intent, but rather only of evidence that he believes would favor his case. Without the additional evidence of the union members who were not terminated, Defendants would be placed in the unfair position of having to defend an allegation that "another union member" also suffered discrimination, or a non-union member did not, without being allowed to present evidence that "many or all other union members did not." That additional evidence, like the evidence of Mr. Ferrell's termination would only result in a delay of the trial of this action or waste of time in presenting evidence that does not bear on the ultimate issue in this case, through which the issues may be confused or the jury may be misled. Evidence of Mr. Ferrell's termination and of any disciplinary action taken or not taken against Sam Ortega, Norma Ferrell or Reynaldo Rosales should therefore not be permitted.

WHEREFORE, PREMISES CONSIDERED, Defendants **CITY OF BROWNSVILLE, TEXAS, CARLOS RUBINSTEIN** and **ARTURO RODRIGUEZ** would respectfully request that upon consideration of the briefing on the issue of the admissibility of Justin Oakerson's termination under Federal Rule of Evidence 404(b), that the Court deny the admission of such evidence, and that Defendants be granted such other and further relief to which they may show themselves to be justly entitled, whether general or special, at law and in equity.

Signed on this the 22nd day of February, 2001.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone    : (956) 504-1100
Facsimile    : (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Defendants,
CITY OF BROWNSVILLE, TEXAS,
CARLOS RUBINSTEIN and
ARTURO RODRIGUEZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **DEFENDANTS' SECOND AMENDED OBJECTION TO ADMISSION OF IMPROPER CHARACTER EVIDENCE** has on this the 22nd day of February, 2001, been forwarded via certified mail, return receipt requested to:

Mr. B. Craig Deats
DEATS & LEVY, P.C.
2204 Lake Austin Blvd.
Austin, TX 78703

Mr. Miguel A. Saldaña
LAW OFFICE OF MIGUEL SALDANA
302 Kings Highway, Suite 109
Brownsville, TX 78521

_____
J. Arnold Aguilar

# EXHIBIT "A"

CbbPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FERRELL | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 99 - 062 |
| CITY OF BROWNSVILLE, | § | |
| ARTURO RODRIGUEZ and | § | |
| CARLOS RUBINSTEIN | § | (JURY REQUESTED) |

---

## AFFIDAVIT OF ARTURO RODRIGUEZ

---

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared **ARTURO RODRIGUEZ**, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

My name is Arturo Rodriguez; I am over 18 years of age, and I reside at 954 E. Madison, Brownsville, Texas 78521. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

Prior to October 10, 1997, I discussed various violations of the City of Brownsville medical protocols that had been committed by Joel Ferrell with Training Officer Brenda Leinweber. I also requested that she provide me a report detailing those infractions and whether she had attempted to counsel with Mr. Ferrell. To the best of my

V:\oc\affidavits\99-148.Art Rodriguez                    **EXHIBIT "C"**

CMPDF - www.fasio.com

recollection, I did not receive that report from Ms. Leinweber until after October 10,

1997. My decision to initiate termination proceedings against Joel Ferrell, and ultimately

to terminate Mr. Ferrell, began with my letter of October 10, 1997, and was based on his

actions on September 20, 1997, although I also considered his history of prior infractions,

counseling, and his being "trended," or having to be evaluated closely to assure he was

following medical protocols.

     Further affiant sayeth not.



ARTURO RODRIGUEZ

     SUBSCRIBED AND SWORN TO BEFORE ME on this _14th_ day of September,

2000, to certify which witness my hand and seal of office.

> OFELIA CAVAZOS
> Notary Public, State of Texas
> My Commission Expires
> December 10, 2003

Notary Public, State of Texas

My commission Expires:

12/10/03

V:oc\affidavits\99-148.Art Rodriguez          **EXHIBIT "C"**

# EXHIBIT "B-1"

CibiPDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FERRELL | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 99 - 062 |
| CITY OF BROWNSVILLE, | § | |
| ARTURO RODRIGUEZ and | § | |
| CARLOS RUBINSTEIN | § | (JURY REQUESTED) |


| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| COUNTY OF CAMERON | § | |

---

## AFFIDAVIT OF J. ARNOLD AGUILAR

---

BEFORE ME, the undersigned official, on this day appeared J. Arnold Aguilar, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

My name is J. Arnold Aguilar and I am over 18 years of age. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

As the attorney for Defendants, City of Brownsville, Texas and Arturo Rodriguez in Civil Action No. B-99-062 in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the deposition of Arturo Rodriguez on November 29, 1999, and state that the excerpts from the transcript of Arturo Rodriguez' deposition testimony attached to Defendants' First Amended Objection to Admission of Improper Character Evidence are true records of the testimony given by Arturo Rodriguez.

PAGE 1 OF 2

Further affiant sayeth not.



J. Arnold Aguilar


SUBSCRIBED AND SWORN TO BEFORE ME on the 16th day of November, 2000, to certify which witness my hand and official seal.


NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS


My Commission Expires:

03/27/03


PAGE 2 OF 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
JOEL.FERRELL              X
                          X
VS.                       X
                          X    CASE NO. B-99-062
CITY OF BROWNSVILLE,      X
ARTURO RODRIGUEZ, AND     X
CARLOS RUBINSTEIN         X
```

---

ORAL DEPOSITION OF
ARTURO RODRIGUEZ
NOVEMBER 29, 1999

---

ORAL DEPOSITION OF ARTURO RODRIGUEZ, produced
as a witness duly sworn by me at the instance of the
PLAINTIFF, taken in the above styled and numbered cause
on NOVEMBER 29, 1999, before SHELLEY STINGLEY,
Certified Shorthand Reporter No. 5725 in and for the
State of Texas, at the offices of J. Arnold Aguilar,
Artemis Square, Suite H-2, 1200 Central Boulevard,
Brownsville, Texas.



BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

16:52  1    that he violated?

16:52  2        A.  No, protocol -- Brenda gave me copies of the

16:52  3    protocols and SOPs.

16:52  4        Q.  Were you conducting any investigation of Rey

16:52  5    Rosales at this point?

16:52  6        A.  I can only handle one at a time.  I was

16:52  7    getting -- based on the copies that I would get here,

16:52  8    some of those would be copied and starting to Rey

16:52  9    Rosales.  But Mr. Ferrell -- and the statement about

16:52 10    them looking for the address, so there was no

16:52 11    investigation based on the comments that I had heard.

16:52 12        Q.  Mr. Rodriguez, based on everything that you

16:52 13    have heard from Mr. Ferrell and read in the various

16:52 14    reports, is there any question in your mind that

16:52 15    Mr. Trevino was dead when Mr. Ferrell first examined

16:52 16    him?

16:53 17        A.  Say it again.

16:53 18        Q.  Do you have any reason to doubt that

16:53 19    Mr. Trevino was dead when Mr. Ferrell first examined

16:53 20    him on September 20th, 1997?

16:53 21        A.  To doubt?

16:53 22        Q.  Yes, sir.

16:53 23        A.  Doubt?  You're asking me if my opinion is that

16:53 24    -- why I should --

16:53 25        Q.  Based on everything that you have read,

16:53  1    everything Mr. Ferrell has told you, did you have any
16:53  2    information that leads you to doubt whether Mr. Trevino
16:53  3    was dead when Mr. Ferrell first examined him on
16:53  4    September 20th?
16:53  5        A.  Based on the run report, it's condition of
16:53  6    following the medical protocols.
16:53  7        Q.  Yes, sir, but that's not my question.  Do you
16:53  8    have any reason, based on anything you have seen, read,
16:53  9    or been told, to believe that Mr. Trevino was not dead
16:53 10    when Mr. Ferrell first examined him on September 20th?
16:53 11            MR. AGUILAR:  Objection; speculation.
16:53 12        Q.  Go ahead and answer.
16:53 13        A.  I still -- I don't really understand your
16:54 14    question.
16:54 15        Q.  Do you have any reason to doubt that
16:54 16    Mr. Trevino was dead when Mr. Ferrell first examined
16:54 17    him on September 20?
16:54 18            MR. AGUILAR:  Objection; vague,
16:54 19    speculation.
16:54 20        Q.  Go ahead and answer.
16:54 21        A.  Can you be more specific?
16:54 22        Q.  I don't know how you could be more specific
16:54 23    than "dead."  Based on the -- you reviewed the run
16:54 24    reports, you reviewed what Mr. Ferrell has told you and
16:54 25    what he's written about the incident, correct?

16:54 1   A. Well, I guess what I'm trying to say is when

16:54 2   you say "dead," I take "dead" to mean over yonder,

16:54 3   cadaver material. I mean, I take that -- is that what

16:54 4   you're saying?

16:54 5   Q. Yes, sir. Do you have any reason to doubt that

16:54 6   he was dead at the time that Mr. Ferrell first examined

16:54 7   him on September 20th, 1997?

16:54 8   A. Based on the data I read, sir, yes.

16:54 9   Q. And what in the data you read indicates to you

16:55 10  that he might have been alive?

16:55 11  A. It's actually the lack of data.

16:55 12  Q. And what data was missing?

16:55 13  A. A full assessment.

16:55 14  Q. And what more assessment should Mr. Ferrell

16:55 15  have done than he did?

16:55 16  A. Turn the patient over.

16:55 17  Q. Turn the patient over?

16:55 18  A. Yes, to look for lividity, for rigor mortis.

16:55 19  Q. Okay, anything else he should have done?

16:55 20  A. Based -- those were -- basically, a full

16:55 21  assessment, is what I'm saying.

16:55 22  Q. But I'm just asking you, you're saying a full

16:55 23  assessment, and I'm saying, what does that involve more

16:55 24  than what Mr. Ferrell actually did?

16:55 25       MR. AGUILAR: He's asking what should

16:55 1   Mr. Ferrell have done, I think.

16:55 2       A.  Oh, what should he have done?

16:55 3       Q.  Yes.

16:55 4       A.  Okay.

16:55 5       Q.  And you have identified he should have turned

16:55 6   him over.

16:55 7       A.  Okay.  Look -- what's called head-to-toe survey

16:55 8   in EMS terms, which involves looking the patient over

16:55 9   visually, from head to toe, and that aids in their

16:56 10  determination of whether any lividity or rigor mortis

16:56 11  is present; upon opening the airway, as he did, and

16:56 12  checking for the foam.  There is the cessation of care

16:56 13  at that point in time.

16:56 14          MR. AGUILAR:  He's just asking what should

16:56 15  he have done.

16:56 16          THE WITNESS:  Okay.

16:56 17      Q.  More than he did to determine that Mr. Trevino

16:56 18  was in fact dead?

16:56 19      A.  Well, once care was initiated, it shouldn't

16:56 20  have been stopped until the person got to the hospital.

16:56 21      Q.  If in fact he was initiating care when he

16:56 22  suctioned him, right?

16:56 23      A.  Well, he initiated the suction.

16:56 24      Q.  The suctioning, in your opinion, was initiation

16:56 25  of care?

16:56 1     A.  It's not an opinion.  It's in the protocol, in
16:56 2 the old protocols.
16:56 3     Q.  In the old protocols?
16:56 4     A.  Yes, sir.
16:56 5     Q.  Suctioning is the initiation of care?
16:57 6     A.  It's under "Any Airway Procedures."  Okay, I'm
16:57 7 referring to page 2 of the old protocols that read
16:57 8 "Airway Management," and I'll read it out.  "Airway
16:57 9 management is the primary concern for all patients who
16:57 10 are examined and treated by Brownsville EMS personnel.
16:57 11 Appropriately authorized personnel by the Medical
16:57 12 Director will perform any maneuver necessary, within
16:57 13 the scope of their training, to secure and maintain a
16:57 14 patient's airway."
16:57 15     Q.  Yes, sir, but I didn't hear anything in that
16:57 16 that indicated that checking an airway to make sure it
16:57 17 was open is the initiation of treatment.
16:57 18             MR. AGUILAR:  What's the question?
16:57 19             MR. DEATS:  Yeah, that's the question.
16:57 20             MR. AGUILAR:  No, what is the question?
16:57 21 You said you didn't hear anything in there.
16:57 22     Q.  Okay, that sentence you just read --
16:58 23     A.  Yes, sir.
16:58 24     Q.  -- is that your basis for stating that checking
16:58 25 to see if an airway is open is initiation of treatment?

16:58  1          A.   Yes, sir.

16:58  2          Q.   Okay.  Do you have any other basis?

16:58  3          A.   Establishing patient contact or maneuvers on a

16:58  4     patient is considered initiation of patient care.

16:58  5          Q.   What is?

16:58  6          A.   Establishing -- he performed a maneuver.

16:58  7          Q.   And what was the maneuver he performed?

16:58  8          A.   Suctioning the patient with a V-Vac.

16:58  9          Q.   Okay, but my question is, is there anything

16:58 10     else in the protocols or standard operating procedures

16:58 11     that indicates that his suctioning that patient

16:58 12     constituted the initiation of care, other than what you

16:58 13     have already read to me?

16:59 14          A.   I'm trying to think.  The lack of establishing

16:59 15     medical control.

16:59 16          Q.   What does that mean?

16:59 17          A.   Not calling the doctor to stop care.

16:59 18          Q.   Well, no, but I'm asking you, is there anything

16:59 19     else in your protocols or SOPs that indicates that

16:59 20     suctioning a patient to see if there is an obstruction

16:59 21     is initiation of patient care, other than what you have

16:59 22     already read me?

16:59 23               MR. AGUILAR:  Do you understand what he's

16:59 24     asking?

16:59 25          A.   No, if it's there, I don't understand what he's

17:18  1          A.   Correct.

17:18  2          Q.   And I'm looking down at about the fourth

17:18  3   paragraph.  Do you see that paragraph, where it says,

17:18  4   "Absence of vital signs does not 'automatically'

17:18  5   authorize EMS personnel to assume the patient is dead"?

17:18  6          A.   Yes, sir.

17:18  7          Q.   Okay.  But that paragraph says, "A patient may

17:18  8   be considered DOS," dead on scene, "if any of the

17:18  9   following is present," and then it lists some factors?

17:18 10          A.   What it asks for is -- it's trying to make the

17:18 11   paramedic be prudent and do a full assessment.

17:18 12          Q.   But if any of those factors in that list is

17:18 13   present, then the patient may be considered dead on

17:18 14   scene under the standard operating procedure, correct?

17:18 15          A.   Correct.  And the word "documented" is

17:18 16   underlined.

17:18 17          Q.   Well, you're --

17:19 18               MR. AGUILAR:   Just answer the question.

17:19 19          A.   Yes.

17:19 20          Q.   -- jumping ahead of me.  One of the factors

17:19 21   listed is "Documented prolonged (more than 20 minutes)

17:19 22   down time (except in cold temperature deaths)."

17:19 23          A.   Correct, sir, yes.

17:19 24          Q.   And there's no question this was a cold

17:19 25   temperature death, was there?

17:19  1      A.   There's no evidence that I have.

17:19  2      Q.   So if Mr. Ferrell had a situation where he had

17:19  3   documented prolonged, more than 20 minutes, downtime,

17:19  4   then he could consider the patient dead on the scene,

17:19  5   correct?

17:19  6      A.   Factual documented is the -- yes.

17:19  7           MR. AGUILAR:   The question is just

17:19  8   whether.

17:19  9      Q.   And when we say "down time," what does down

17:19  10  time mean?

17:19  11     A.   Person's down time.   By definition -- and some

17:19  12  of the terms that are being used here are terms that

17:19  13  the schools utilize.

17:19  14     Q.   And I'm asking you as a layperson, what does

17:19  15  "down time" mean?

17:19  16     A.   It means the person's time when they stopped

17:19  17  breathing, not what someone perceives to be --

17:20  18     Q.   Okay.

17:20  19     A.   It's when the person went from -- I guess in

17:20  20  CPR, when you learn CPR, bystander CPR, they talk to

17:20  21  you about clinical and biological death.

17:20  22     Q.   So down time simply means time that the patient

17:20  23  is not breathing?

17:20  24     A.   Correct.

17:20  25     Q.   And it says, "Documented" -- and that word is

17:20 1    underlined -- "Documented prolonged (more than 20

17:20 2    minutes) down time," right?

17:20 3         A.  Yes, sir.

17:20 4         Q.  And what, to you, constitutes documented down

17:20 5    time?

17:20 6         A.  There is no set -- every run is different, so

17:20 7    you have to use different parameters to rely on what

17:20 8    you consider to be documented.

17:20 9         Q.  Okay.  So you can't give me a quick and easy

17:20 10   answer on what constitutes documented down time?

17:20 11        A.  I can tell you what constituted documented to

17:20 12   this -- to the run we're talking about but not in a

17:21 13   general way or form.

17:21 14        Q.  Okay.  So what constitutes documented down time

17:21 15   means something different in each situation?

17:21 16        A.  It may.  Every run is different and -- yes.

17:21 17        Q.  Okay.  What do you have to do to document down

17:21 18   time?

17:21 19        A.  Well, you ask the medics questions, you go up

17:21 20   on your response time tables, utilize whatever

17:21 21   information the medics can give you or whatever they

17:21 22   charted, whatever assessment.  You use their assessment

17:21 23   to tell you the story of it.  You also use any of the

17:21 24   records that you --

17:21 25        Q.  And what about the paramedic on the scene and

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION

3   JOEL FERRELL                    X
                                    X
4   VS.                             X
                                    X   CASE NO. B-99-062
5   CITY OF BROWNSVILLE,            X
    ARTURO RODRIGUEZ, AND           X
6   CARLOS RUBINSTEIN               X

7
                   REPORTER'S CERTIFICATE
8
9          I, SHELLEY STINGLEY, Certified Court
    Reporter, certify that the witness, ARTURO RODRIGUEZ,
10  was duly sworn by me, and that the deposition is a true
    and correct record of the testimony given by the
11  witness on NOVEMBER 29, 1999; that the deposition was
    reported by me in stenograph and was subsequently
12  transcribed under my supervision.

13         I FURTHER CERTIFY that I am not a
    relative, employee, attorney or counsel of any of the
14  parties, nor a relative or employee of such attorney or
    counsel, nor am I financially interested in the action.

15         WITNESS MY HAND on this the _20_ day of
    _December_____, 1999.
16

17              _Shelley Stingley_
    SHELLEY STINGLEY, CSR NO. 5725
18  Expiration Date: 12-31-00
    Bryant & Stingley, Inc.
19  2010 East Harrison
    Harlingen, Texas  78550

20

21

22

23

24

25

# EXHIBIT "B-2"

CVsPDF – www.fixrio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FERRELL | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 99 - 062 |
| CITY OF BROWNSVILLE, | § | |
| ARTURO RODRIGUEZ and | § | |
| CARLOS RUBINSTEIN | § | (JURY REQUESTED) |

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| COUNTY OF CAMERON | § | |

## AFFIDAVIT OF J. ARNOLD AGUILAR

BEFORE ME, the undersigned official, on this day appeared J. Arnold Aguilar, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

My name is J. Arnold Aguilar and I am over 18 years of age. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

As the attorney for Defendants, City of Brownsville, Texas and Arturo Rodriguez in Civil Action No. B-99-062 in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the deposition of Arturo Rodriguez on July 13, 2000, and state that the excerpts from the transcript of Arturo Rodriguez' deposition testimony attached to Defendants' First Amended Objection to Admission of Improper Character Evidence are true records of the testimony given by Arturo Rodriguez.

PAGE 1 OF 2

Further affiant sayeth not.



J. Arnold Aguilar

SUBSCRIBED AND SWORN TO BEFORE ME on the 16th day of November, 2000, to certify which witness my hand and official seal.

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My Commission Expires:

03/27/03

PAGE 2 OF 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FERRELL | X | |
| | X | |
| VS. | X | |
| | X | CIVIL ACTION NO. B-99-062 |
| CITY OF BROWNSVILLE, | X | |
| ARTURO RODRIGUEZ, AND | X | |
| CARLOS RUBINSTEIN | X | |

| | | |
|---|---|---|
| JUSTIN OAKERSON | X | |
| | X | |
| VS. | X | |
| | X | CIVIL ACTION NO. B-99-197 |
| CITY OF BROWNSVILLE, | X | |
| ARTURO RODRIGUEZ, AND | X | |
| CARLOS RUBINSTEIN | X | |

---

ORAL DEPOSITION OF
ARTURO RODRIGUEZ
JULY 13, 2000
VOLUME 2

---

VOLUME 2 of the ORAL DEPOSITION OF ARTURO RODRIGUEZ, produced as a witness duly sworn by me at the instance of the PLAINTIFFS, taken in the above styled and numbered causes on JULY 13, 2000, before MAUREEN STINGLEY, Certified Shorthand Reporter No. 691 in and for the State of Texas, at the offices of J. Arnold Aguilar, Artemis Square, Suite H-2, 1200 Central Boulevard, Brownsville, Texas.

COPY

BRYANT & STINGLEY, INC.
McAllen            Harlingen            Brownsville
(956)618-2366      (956)428-0755        (956)542-1020

10:43 1    right?

10:43 2        A.  Yes, sir.

10:43 3        Q.  And Section 801, you can see, indicates that

10:43 4    disciplinary action may be administered for just cause?

10:43 5        A.  Yes, sir.

10:43 6        Q.  And it indicates that disciplinary action may

10:43 7    be administered by the division head or the department

10:43 8    head, correct?

10:43 9        A.  Yes, sir.

10:43 10       Q.  Is Brownsville EMS considered a division, a

10:43 11   department, or what?

10:43 12       A.  A department.

10:43 13       Q.  So you are a department head?

10:43 14       A.  Yes, sir.

10:43 15       Q.  Okay.  As a practical matter -- excuse me.

10:44 16   When you talk about the appeal to the city manager, if

10:44 17   you look at Section 808, which is on page 38, that's

10:44 18   the appeal that you're talking about?

10:44 19       A.  Yes, sir.

10:44 20       Q.  Okay.  Now, is the city manager actually

10:44 21   involved in the process before the appeal takes place?

10:44 22       A.  No, sir.

10:44 23       Q.  Okay, you wrote a letter to Mr. Rubinstein

10:44 24   about Joel Ferrell's termination, did you not?

10:44 25       A.  Yes.

| 10:44 | 1 | Q. And the purpose of that letter was to explain |
| 10:44 | 2 | your rationale? |
| 10:44 | 3 | A. Yes, sir. |
| 10:44 | 4 | Q. Okay. And did you write that letter before or |
| 10:44 | 5 | after Mr. Ferrell appealed his case to Mr. Rubinstein? |
| 10:45 | 6 | A. I believe it was before. |
| 10:45 | 7 | Q. Okay. |
| 10:45 | 8 | A. There would be a date on that letter. |
| 10:45 | 9 | Q. Sure. If we look at a copy of the letter |
| 10:45 | 10 | itself, which is Deposition Exhibit 4 to your |
| 10:45 | 11 | deposition -- |
| 10:45 | 12 | A. Yes, sir. |
| 10:45 | 13 | Q. -- the date on the document is November 21, |
| 10:45 | 14 | 1997, correct? |
| 10:45 | 15 | A. Correct. |
| 10:45 | 16 | Q. Is that at or about the time that you wrote |
| 10:45 | 17 | that letter? |
| 10:45 | 18 | A. Yes, sir. |
| 10:45 | 19 | Q. Okay. So within a day or so, that November 21, |
| 10:45 | 20 | 1997 date is the date that you wrote to Mr. Rubinstein |
| 10:46 | 21 | about your reasons for terminating Mr. Ferrell? |
| 10:46 | 22 | A. Yes, sir. |
| 10:46 | 23 | Q. Now, if we look back at -- oh, by the way, when |
| 10:46 | 24 | the city manager makes his decision on the appeal, is |
| 10:46 | 25 | there any appeal of the city manager's decision? |

10:48   1    decisions, correct?

10:48   2        A.   Correct.

10:48   3        Q.   How many people would you say that you fired

10:48   4    from Brownsville EMS while you have been the director?

10:49   5        A.   Would you give me a minute to think?

10:49   6        Q.   Sure.

10:49   7        A.   I believe there have been three.

10:49   8        Q.   And does that include Mr. Oakerson?

10:49   9        A.   No, sir.

10:49  10        Q.   Okay.   Because you consider him to have failed

10:49  11    probation, correct?

10:49  12        A.   Yes, sir.

10:49  13        Q.   So you fired three employees besides

10:49  14    Mr. Oakerson?

10:49  15        A.   Correct.

10:49  16        Q.   Mr. Oakerson would be a fourth employee whose

10:49  17    employment was involuntarily terminated while you were

10:49  18    the director?

10:49  19        A.   Correct, and I'm not counting -- there has been

10:49  20    several employees that have not passed probation.

10:49  21        Q.   Okay.

10:49  22        A.   I couldn't give you a number on that, sir.

10:49  23        Q.   When you say several employees have not passed

10:49  24    probation, how many of those have been promotional

10:49  25    probation?

10:49  1         MR. AGUILAR:  Objection; form.  What's a

10:49  2    promotional probation?

10:49  3         Q.  Well, promotional probation is discussed in the

10:49  4    personnel files.  You're familiar with that term?

10:49  5         A.  Yes, sir, it's --

10:50  6         MR. AGUILAR:  As long as you're using the

10:50  7    term that's --

10:50  8         MR. DEATS:  Yeah, it's in the --

10:50  9         MR. AGUILAR:  If he is familiar with it,

10:50 10    it's part of the file, that's fine.

10:50 11         Q.  Well, if we look at the personnel policies,

10:50 12    Section 309 specifically talks about promotional

10:50 13    probation, correct?

10:50 14         A.  Yes, sir.  On page 9?

10:50 15         Q.  Yes, sir, it's on page 9.  And I believe that

10:50 16    page is included.  How many employees have you failed

10:50 17    on promotional probation?

10:50 18         A.  I have asked employees to apply for the job.

10:50 19    The way I understood the section was I would have a

10:50 20    person that's -- my understanding of promotional policy

10:50 21    is I do the active role in saying, "I want you to be my

10:50 22    next" -- whatever that position is.  That's the way I

10:50 23    understand a promotional policy.

10:50 24         In the department, I did not use this

10:51 25    policy.  I, rather, wanted the employee to take the

10:51  1    initiative and apply for the position.

10:51  2         Q.  So rather than seeking out employees for

10:51  3    promotion, you asked them to apply, if they were

10:51  4    interested?

10:51  5         A.  Yes, sir.

10:51  6         Q.  And then you selected among the candidates?

10:51  7         A.  Yes, sir.

10:51  8         Q.  Okay.  And you feel like that was not in accord

10:51  9    with this promotional policy that's in the old

10:51  10   personnel policies?

10:51  11        A.  As I understood it.

10:51  12        Q.  Well, so again my question, after you promoted

10:51  13   employees, how many employees did you fail during the

10:51  14   promotional probation?

10:51  15        A.  I don't know, sir.

10:51  16        Q.  Would it be -- we know that you failed

10:52  17   Mr. Oakerson, correct?

10:52  18        A.  Yes, sir, that's one of them.

10:52  19        Q.  Were there any others?

10:52  20        A.  Yes, there was another employee, but --

10:52  21        Q.  What was his name?

10:52  22        A.  It was based on --

10:52  23             MR. AGUILAR:  Well, objection to the

10:52  24   request that you're asking for a specific name.  Again,

10:52  25   because of the employee's rights to privacy and the

```
11:11  1        Q.  So do you need me to repeat the question?
11:11  2        A.  Yes, sir.
11:11  3             MR. AGUILAR:  Maybe rephrase it or
11:11  4   something.
11:11  5        Q.  So at the time that you had this conversation
11:11  6   with Mr. Oakerson about what would happen if he failed
11:11  7   promotional orientation, you already understood under
11:11  8   the new policy that he couldn't simply revert back to
11:11  9   his old position?
11:11  10       A.  Yes, sir.
11:11  11       Q.  Now let's move up to the question you were
11:11  12  trying to answer a moment ago.
11:11  13       A.  Okay.
11:11  14       Q.  At the time you told him that he had failed his
11:11  15  promotional orientation, you told him at that point
11:11  16  that he was out of a job, didn't you?
11:11  17       A.  Yes, sir.
11:11  18       Q.  And you're testifying that you told him, even
11:11  19  though he was out of a job, that he could reapply for
11:11  20  his old job?
11:11  21       A.  As a paramedic, yes, sir.
11:12  22       Q.  Right, and start over again?
11:12  23       A.  Well, just that --
11:12  24       Q.  He would be a new City of Brownsville employee.
11:12  25  If he reapplied and got reaccepted, he would be a
```

11:12  1    new --

11:12  2         A.   I don't know that because HR handles that.   I

11:12  3    would·be answering a question that I don't know the

11:12  4    facts to.

11:12  5         Q.   So at the time you told Mr. Oakerson that he

11:12  6    was being let go, because that was the effect of your

11:12  7    decision --

11:12  8         A.   Yes, sir.

11:12  9         Q.   -- do you recall making a statement to him

11:12 10    about whether or not he could reapply for his old

11:12 11    position?

11:12 12         A.   Yes, sir.

11:12 13         Q.   And what statement do you recall making to him?

11:12 14         A.   That he could come back and apply to become a

11:12 15    paramedic.

11:12 16         Q.   Okay.  Did you indicate to him by tone or

11:12 17    otherwise how you might react to his reapplication?

11:12 18         A.   No, sir.

11:12 19         Q.   Okay.  Did you indicate to him that you would

11:12 20    willingly consider him for a paramedic position if he

11:13 21    reapplied?

11:13 22         A.   As I recall, my tone was being conversatory.

11:13 23    It wasn't --

11:13 24         Q.   Conversational?

11:13 25         A.   Conversational.  It wasn't with any underlying

```
11:13  1    tones of anything.
11:13  2        Q.  Did you have any paramedic openings at the time
11:13  3    you let Mr. Oakerson go?
11:13  4        A.  I had no full-time paramedic openings at that
11:13  5    time.
11:13  6        Q.  Did you have any part-time openings?
11:13  7        A.  I believe there was a part-time opening.
11:13  8        Q.  Was it for a specific time slot?
11:13  9        A.  Can you --
11:13 10        Q.  I mean, you know, work certain hours of the
11:13 11    day, certain days of the week?
11:13 12        A.  Well, it's more restrictive because it's a
11:13 13    part-time.  That's really when we need the employees,
11:13 14    yes, sir.
11:13 15        Q.  Do you recall whether or not you told
11:13 16    Mr. Oakerson during the same conversation that you had
11:13 17    a part-time position available?
11:14 18        A.  I don't recall.
11:14 19        Q.  Do you recall whether or not in your mind at
11:14 20    that time you had an impression about whether or not
11:14 21    you would rehire Mr. Oakerson if he applied for a
11:14 22    paramedic position?
11:14 23            MR. AGUILAR:  Do you understand the
11:14 24    question?
11:14 25            THE WITNESS:  No.
```

11:14  1          MR. AGUILAR:  Would you rephrase it?

11:14  2      Q.  At the time you let Mr. Oakerson go, did you

11:14  3  have an impression in your mind about whether you would

11:14  4  be willing to rehire him if he applied for a paramedic

11:14  5  position?

11:14  6      A.  Yes, sir.

11:14  7      Q.  And what was the --

11:14  8      A.  I would be willing to rehire him.

11:14  9      Q.  And then my next question, did you tell him

11:14  10  that?

11:14  11      A.  No, I didn't.

11:14  12      Q.  Why didn't you tell him that?

11:14  13      A.  Because as I understand, to me that's a leading

11:14  14  question.  It's being --

11:15  15          MR. AGUILAR:  Could I suggest a word?

11:15  16          MR. DEATS:  Sure.

11:15  17          MR. AGUILAR:  "Suggestive."

11:15  18      A.  -- suggestive.  As I understood, I could not be

11:15  19  suggestive.

11:15  20      Q.  And who told you you could not be suggestive?

11:15  21      A.  No one told me.  I just --

11:15  22      Q.  Did you understand that from something you read

11:15  23  in the policy?

11:15  24      A.  Well, I told him he was welcome to apply to a

11:15  25  paramedic.  To me, that suggestive.

11:15 1    Q.  But you didn't tell him that you would rehire

11:15 2    him if he did apply, did you?

11:15 3        A.  No, I didn't.  And to answer that question, my

11:15 4    thought was because any time employees apply, I need to

11:15 5    evaluate employees based on -- it enters another realm

11:15 6    of employment, sir.

11:15 7        Q.  So at that point in time, you hadn't made any

11:15 8    decision in your own mind about whether you would

11:16 9    rehire Justin Oakerson if he did apply?

11:16 10       A.  No, I would rehire him because he is qualified.

11:16 11       Q.  But I thought you just said that you hadn't

11:16 12   made --

11:16 13       A.  I can't lead them to believe.  Am I making

11:16 14   sense?  I can't lead them to -- I don't want to mislead

11:16 15   them and say, "Apply and you're going to get the job,"

11:16 16   because there may be two or three other applicant who

11:16 17   may have a better -- more experience or something, and

11:16 18   HR may recommend to hire another person.

11:16 19       Q.  I see.  So you couldn't be sure that you would

11:16 20   rehire him if he reapplied because you didn't know what

11:16 21   circumstances might exist?

11:16 22       A.  That would be around it, yeah.

11:16 23       Q.  Under the old policy, if you had failed him --

11:16 24   his promotional probation, he would automatically have

11:16 25   gone back to his prior position, right?

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3      JOEL FERRELL                X
                                    X
 4      VS.                         X
                                    X   CIVIL ACTION NO. B-99-062
 5      CITY OF BROWNSVILLE,        X
        ARTURO RODRIGUEZ, AND       X
 6      CARLOS RUBINSTEIN           X

 7
        JUSTIN OAKERSON             X
 8                                  X
        VS.                         X
 9                                  X   CIVIL ACTION NO. B-99-197
        CITY OF BROWNSVILLE,        X
10      ARTURO RODRIGUEZ, AND       X
        CARLOS RUBINSTEIN           X
11
                    REPORTER'S CERTIFICATE
12
                  I, MAUREEN STINGLEY, Certified Court
13      Reporter, certify that the witness, ARTURO RODRIGUEZ,
        was duly sworn by me, and that VOLUME 2 of the
14      deposition is a true and correct record of the
        testimony given by the witness on JULY 13, 2000; that
15      the deposition was reported by me in stenograph and was
        subsequently transcribed under my supervision.
16
                  I FURTHER CERTIFY that I am not a relative,
17      employee, attorney or counsel of any of the parties,
        nor a relative or employee of such attorney or counsel,
18      nor am I financially interested in the action.

19                  WITNESS MY HAND on this the 28th day of
                                  , 2000.
20

21                  Maureen Stingley by YJ
                    MAUREEN STINGLEY, CSR/NO. 691
22                  Expiration Date: 12/31/00
                    Bryant & Stingley, Inc.
23                  2010 East Harrison
                    Harlingen, Texas  78550
24

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

# EXHIBIT "C"

CutePDF - www.fastio.com

## AFFIDAVIT OF JUSTIN OAKERSON

STATE OF TEXAS     §
                    §
COUNTY OF CAMERON   §

     I, Justin Oakerson, am over 21 years of age and am competent to make this affidavit. Having been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge and are true and correct.

     1.     My name is Justin Oakerson. My current address is 179-B Glenbrook, Brownsville, Texas 78520. My current work telephone number is (956) 544-8278.

     2.     I was employed by the Brownsville Emergency Medical Services (BEMS) Department for several years until my termination on June 22, 1999. At the time of my termination, I was the BEMS Training Officer.

     3.     In the Spring of 1997, Joel Ferrell organized a group of other employees, including me, to solicit BEMS employees for membership in Brownsville Fire Fighters Association (BFFA). Although others of us were involved in the organizing effort, it was common knowledge that Mr. Ferrell was spearheading the organizing effort until the time of his termination in September 1997. To my knowledge, BEMS Director Arturo Rodriguez was unaware of the fact that I was assisting Mr. Ferrell in 1997.

     4.     After Joel Ferrell was fired by Mr. Rodriguez in the Fall of 1997, the union movement stalled. Everyone was afraid of retaliation if Mr. Rodriguez discovered they were involved with the union or the organizing effort. Discussion of the union organizing drive almost totally ceased for more than a year. I ceased my activities on the BFFA's behalf.

     5.     In early 1999, I was promoted from Paramedic to BEMS Training Officer. The position became available after the accidental death of the former Training Officer, Brenda Leinwebber.

     6.     After becoming Training Officer, I decided to see if I could get the union organizing drive restarted. I therefore began talking to other BEMS employees again about

1

joining the union. Although the employees I talked to initially continued to be afraid because of what had happened to Mr. Ferrell, I was successful in convincing a number of employees to re-join the BFFA. By February 1999, largely through my efforts, more than half of the BEMS employees had joined or re-joined the BFFA.

7.      In March 1999, I helped the BFFA officers organize a meeting between BEMS employees, Brownsville Mayor Henry Gonzalez, and Brownsville City Commissioner John Wood. Because the meeting occurred on a weekday during my working hours, I was unable to attend. Nonetheless, I helped organize the meeting and publicized it to the employees of the each shift. About ten employees attended the meeting, the purpose of which was to address the employment concerns of BEMS employees. Approximately a week after the meeting, I *received a negative evaluation from Assistant EMS Director Jeff Johnson and an informal reprimand from Mr. Rodriguez* concerning issues related to employee complaints made at the meeting with Mayor Gonzalez and Commissioner Wood.

8.      In late April 1999, the City of Brownsville opened a new Fire Station 8. I attended the opening of the station as a representative of the BFFA. I agreed to pose for a picture with the Mayor and BFFA officers. In late April, a campaign ad placed in the Brownsville newspaper by the Mayor featured a picture of me with the BFFA President and Vice President. The caption to the picture identified me and my position with BEMS, and identified the BFFA President and Vice President by listing their name, Fire Department position, and BFFA position.

9.      Shortly after my picture was printed in the Brownsville newspaper I went on vacation for approximately two weeks. After returning from vacation, I resumed my normal duties. However, on June 22, 1999, Mr. Rodriguez called me into his office on a pretext. When I arrived for the meeting, Mr. Rodriguez told me I had not successfully completed my probation as Training Officer and that my employment was being terminated effective immediately. Mr. Rodriguez did not tell me when I was promoted to Training Officer that I would be fired rather than demoted if I failed to successfully complete my probation as Training Officer. Knowing that

2

BEMS had Paramedic vacancies, I asked if I could reapply for my prior part-time position as a Paramedic. Mr. Rodriguez told me I should thank him for allowing me to be Training Officer. He told me that he didn't know if part-time positions were available. He told me I could reapply for a Paramedic position if I wanted, but the tone of his voice let me know that this would be a futile gesture. He suggested that I try to reapply at the college where I had taught previously. I appealed the termination to City Manager Carlos Rubinstein, but was told that as a probationary employee I had no right of appeal.

10.     I have reviewed the November 21, 1997 memorandum to Carlos Rubinstein from Arturo Rodriguez concerning the emergency medical call made by Joel Ferrell on September 20, 1997. In my opinion, and based on my experience as a Paramedic Instructor both in the Brownsville EMS and at the University of Texas at Brownsville, Mr. Ferrell engaged in no misconduct on the September 20, 1997 run. Mr. Ferrell's decision to clear foam from the patient's mouth to see if his airway was obstructed was simply a step taken to evaluate the patient's condition. In this regard, in the Paramedic school we teach students that when a patient is not breathing, the first step is to check the airway to determine if there is an obstruction. This is according to American Heart Association guidelines for advanced cardiac life support. Clearing foam from the patient's mouth to assist in making this determination is part of the evaluation and does not constitute the initiation of treatment. Based on Mr. Ferrell's report of the incident, which I also have reviewed, he appears to have followed BEMS's "dead on the scene" standard operating procedure to the letter.

11.     Mr. Rodriguez's November 21, 1997 memorandum to Mr. Rubinstein indicates that Mr. Ferrell failed to properly apply protocols because he declared the patient dead on the scene without doing an assessment for rigor mortis or lividity. Contrary to Mr. Rodriguez's assertion, Mr. Ferrell did not violate protocol by failing to make this assessment in light of the other factors which Mr. Ferrell noted in his report. Moreover, I personally witnessed Mr. Rodriguez and other BEMS personnel handle another medical call in the same manner. This

3

was a medical call in which two ambulances were dispatched to a house where a gas leak had

resulted in the carbon monoxide poisoning of two persons.   Supervisor Sam Ortega and

Paramedic Norma Ferrell (Mr. Ferrell's ex-wife) were  dispatched to the scene.  Mr. Rodriguez

appeared at the scene and observed.  I also went to the scene with a new employee I was

training to observe the treatment provided.   Mr. Ortega's report states that the Paramedics

observed that one of the two patients was not breathing and had no detectable pulse.  After

checking the patient's airway to make sure it was not blocked, Mr. Ortega attached three leads

of the EKG and verified that the patient had no pulse, no respirations, and no blood pressure.

He then called the patient dead on the scene.  At no time did he "roll" or move the patient to

check for lividity or rigor mortis.   Mr. Rodriguez was present and observed the treatment

provided.  He did not indicate that the treatment provided was in any way incorrect or a violation

of BEMS protocols.  No investigation or discipline of Mr. Ortega resulted from the treatment he

provided to the patient.


     I have read this affidavit, which consists of four (4) pages including this page, and have

been given the opportunity to make any corrections.  I have given this affidavit voluntarily and of

my free choice and, by my signature below, swear that it is true and correct.

_____
Justin Oakerson


     SWORN TO AND SUBSCRIBED before the undersigned notary public who states that
on this _8th_ day of February, 2000 personally appeared before me JUSTIN OAKERSON,
who being by me duly sworn on his oath deposed and said that each and every statement in the
foregoing affidavit is within his personal knowledge and is true and correct.

_____
Notary Public, in and for the State of Texas

My commission expires: _10/23/2001_

PATRICIA M. RIVERA
MY COMMISSION EXPIRES
October 23, 2001

4

# EXHIBIT "D"

## AFFIDAVIT OF FERMIN CAZARES

STATE OF TEXAS       §
                                 §

COUNTY OF CAMERON    §

       I, Fermin Cazares, am over 21 years of age and am competent to make this affidavit. Having been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge and are true and correct.

       1.      My name is Fermin Cazares.   My current address is 4424 Sierra Madre, Brownsville, Texas 78520. My telephone number is (956) 550-9380.

       2.      In 1997 I was employed by the Brownsville Emergency Medical Services (BEMS) Department as a Paramedic.  I was assigned to EMS Station 1, and my partner was Reynaldo Gil. I have since resigned from my position with Brownsville EMS and no longer work there.

       3.      In the Spring and Summer of 1997, a group of employees led by Joel Ferrell were attempting to encourage BEMS employees to join the Brownsville Fire Fighters Association (BFFA).  It was common knowledge among employees in the department that Mr. Ferrell was leading the effort to organize the BEMS employees for the BFFA.

       4.      In the Summer of 1997, a group of employees was gathered in the report room at Station 1.  We were discussing whether or not to join the BFFA.  Justin Oakerson, a fellow employee, wrote the word "UNION" in large block letters on the bulletin board.  With the exception of Mr. Gil and me, the other employees then left.

       5.      A short while after the other employees left, EMS Director Arturo Rodriguez entered the report room. At the time, Mr. Gill was in the next room, and I was alone in the report room. Mr. Rodriguez saw the word "UNION", which was still on the board. He said, "Union? There will never be a union in Brownsville EMS." He then picked up the chalk eraser and began erasing the word from the chalkboard. He looked at me and repeated in Spanish, "There will never be a union in Brownsville EMS."

6.      About this point, Mr. Gil was re-entering the room.  Mr. Rodriguez asked me if I had written the word "UNION" on the chalkboard.  When I denied that I had, he asked me if I knew who did.  I also denied knowing who had written the word.  Mr. Rodriguez then questioned my partner, Mr. Gil.  He asked Mr. Gil if he had written the word on the chalkboard, and when Mr. Gill denied having done it, he asked him if he knew who did.  Like me, Mr. Gil denied knowing who had written the word.  The tone of Mr. Rodriguez's questions was hostile and intimidating, and I felt it would get me into trouble to admit having any knowledge about the union.

7.      On several occasions thereafter, when I was alone with Mr. Rodriguez, he raised the subject of the union organizing effort.  At least one of these conversations occurred in Mr. Rodriguez's office.  During these conversations, Mr. Rodriguez indicated his opposition to unionization of the Brownsville EMS employees and tried to discourage me from becoming involved.  He told me, "You don't need a union."  He also told me, "It's not right for you."  Mr. Rodriguez told me that the BFFA was for the fire fighters, that they could not do anything for EMS employees, and it would be a mistake for the EMS employees to become involved with them.  During these conversations, I did not feel free to voice my own opinions in favor of the union and did not do so.

8.      While working for BEMS in 1997, I was the Field Training Officer for Rigoberto Bocanegra.  Mr. Bocanegra was an Emergency Medical Technician who had been promoted to Paramedic and was serving his probationary period as a Paramedic.  While serving in his probationary period, Mr. Bocanegra and I were assigned to transport a patient to a hospital in McAllen.  During the transport, Mr. Bocanegra was responsible for monitoring the patient's condition.  Rather than doing so, Mr. Bocanegra switched off the lights in the back of the unit and told me that he needed to get some sleep.  He then proceeded to sleep rather than monitor the patient.  This constitutes a violation of BEMS rules and potentially endangers the patient's safety.  I reported Mr. Bocanegra's conduct to Mr. Rodriguez.  Mr. Bocanegra was not

-2

terminated.  Rather, he was simply demoted back to Emergency Medical Technician and allowed to continue working for BEMS.

I have read this affidavit, which consists of three (3) pages including this page, and have been given the opportunity to make any corrections.  I have given this affidavit voluntarily and of my free choice and, by my signature below, swear that it is true and correct.

_____
Fermin Cazares

SWORN TO AND SUBSCRIBED before the undersigned notary public who states that on this _8th_ day of February, 2000 personally appeared before me FERMIN CAZARES, who being by me duly sworn on his oath deposed and said that each and every statement in the foregoing affidavit is within his personal knowledge and is true and correct.

_____
Notary Public, in and for the State of Texas

My commission expires: _10/23/2001_

PATRICIA M. RIVERA
MY COMMISSION EXPIRES
October 23, 2001

3

# EXHIBIT "E"

CVISPDF – www.fastio.com

Case 1:99-cv-00197   Document 35   Filed in TXSD on 02/22/2001   Page 61 of 104

## AFFIDAVIT OF ALFREDO CHRISTMAN

STATE OF TEXAS      §
                    §
COUNTY OF CAMERON   §

I, Alfredo Christman, am over 21 years of age and am competent to make this affidavit. Having been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge and are true and correct.

1. My name is Alfredo Christman. My current address is 45 Oro Circle, Brownsville, Texas 78521. My current telephone number is (956) 544-4856.

2. At all times between 1997 and the present, I have been the President of the Brownsville Professional Fire Fighters Association (BFFA), also known as the International Association of Fire Fighters, Local 970. The BFFA and the IAFF are labor unions that represent and seek to represent fire fighters and emergency medical services employees in the United States and Canada. The BFFA seeks to represent employees of the Brownsville Fire Department and the Brownsville Emergency Medical Services Department.

3. In the Spring of 1997, BEMS employee Joel Ferrell approached me about organizing the BEMS employees for the BFFA. I put the question to my membership, which voted to attempt to organize the BEMS. I then gave Mr. Ferrell the green light, and he spearheaded the union organizing effort.

4. In May 1997, I approached Brownsville City Manager Carlos Rubinstein to seek payroll dues deductions for BEMS employees. The City had already approved payroll dues deductions for Fire Department employees. However, Mr. Rubinstein refused to allow payroll dues deductions for BEMS employees, even payroll deductions are allowed for City employees for any number of other reasons.

4. In mid to late June 1997, I approached BEMS Director Arturo Rodriguez about allowing BEMS employees to be on standby at the BFFA's Independence Day picnic to be held on June 29, 1997. I told him that I wanted BEMS employees who are our members to be on standby in case there was some sort of minor medical mishap. In this regard, a couple people

1

had fainted at our prior picnic due to the heat. Mr. Rodriguez did not show any surprise that BEMS employees were members of the BFFA. To the contrary, by his comments he indicated to me that was already well aware of the ongoing union organizing effort. However, he told me that our BEMS members could not provide medical services at the picnic unless I went through the proper channels and obtained approval of the BEMS in advance.

5.    I have been made aware that BEMS Director Arturo Rodriguez claims he did not know Joel Ferrell was a member of the BFFA at the time he terminated Mr. Ferrell's employment on November 21, 1997. This is not true. Mr. Ferrell had two pre-termination hearings, one on October 15, 1997, and a second on October 29, 1997. I appeared at the first pre-termination hearing and told Mr. Rodriguez that I wanted to assist in representing Mr. Ferrell because he was a member of the BFFA. Mr. Rodriguez told me at that time that he did not recognize the BFFA as a representative of BEMS employees and that I could not participate in the pre-termination hearing.

6.    After Joel Ferrell was fired, the BFFA organizing drive among BEMS employees stalled. We were not able to get the organizing drive going again until BEMS Training Officer Justin Oakerson began the organizing effort again more than a year later in early 1999.

I have read this affidavit, which consists of three (3) pages including this page, and have been given the opportunity to make any corrections. I have given this affidavit voluntarily and of my free choice and, by my signature below, swear that it is true and correct.

_Alfredo Christman_
Alfred Christman

SWORN TO AND SUBSCRIBED before the undersigned notary public who states that on this 8th day of February, 2000 personally appeared before me ALFREDO CHRISTMAN, who being by me duly sworn on his oath deposed and said that each and every statement in the foregoing affidavit is within his personal knowledge and is true and correct.

LYDIA L TREVIÑO
Notary Public, State of Texas
My Commission Expires
October 31, 2002

_Lydia L Treviño_
Notary Public, in and for the State of Texas
My commission expires: 10-31-2002

2

# EXHIBIT "F"

CfsbPDF – www.fastio.com

# AFFIDAVIT OF JOEL FERRELL

STATE OF TEXAS     §
                      §

COUNTY OF CAMERON    §

I, Joel Ferrell, am over 21 years of age and am competent to make this affidavit. Having been placed under oath and sworn to tell the truth, I hereby do solemnly swear that the following facts are of my own personal knowledge and are true and correct.

1.     My name is Joel Ferrell. My current address is 1034 Southmark Circle, Harlingen, Texas 78550. My current home telephone number is (956) 425-1963. I am the Plaintiff in *Joel Ferrell v. City of Brownsville, et al.*; CA No. B-99-062, presently pending the in the United States District Court for the Southern District of Texas, Brownsville Division.

2.     I began employment with the Brownsville Emergency Medical Services (BEMS) Department in 1993. Between that date and my termination in November 1997, I was employed by BEMS as a Paramedic. All evaluations of my performance indicated that my performance as a Paramedic was satisfactory.

3.     In early 1997, I decided to explore the possibility of organizing the BEMS employees for the Brownsville Professional Fire Fighters Association (BFFA), also known as the International Association of Fire Fighters, Local 970. My cousin, previously an officer with the Texas State Association of Fire Fighters, had told me that the International Association of Fire Fighters was encouraging its locals to organize emergency medical services employees. My cousin gave me the names and phone numbers of the BFFA's officers, and I contacted them to see if they would be interested in organizing the BEMS. The BFFA officers in turn raised the matter with the BFFA's membership, which then included only Brownsville fire fighters. The membership voted to organize the BEMS employees. This vote occurred on or about February 13, 1997. After the vote was taken, I organized a small group of BEMS employees who, like me, were interested in associating with the BFFA. Thereafter, we began actively recruiting BEMS employees to join the BFFA.

1

4.      In the months following the BFFA's vote to organize BEMS employees, I led the organizational effort.  I openly solicited BEMS employees to join the BFFA.  I spoke to other employees, and I spoke to the BEMS supervisors about joining the BFFA.  I made no attempt to hide my activities on behalf of the BFFA.  Rather, I utilized every opportunity to talk about the BFFA and to encourage BEMS employees to join it.  It was common knowledge among BEMS employees that I was spearheading the union organizing effort.  I often initiated conversations with others about the union, and many employees approached me to ask questions about the BFFA and what it could do for BEMS employees.

5.      The International Association of Fire Fighters, AFL-CIO-CLC, is a labor union which represents and seeks to represent fire fighters and emergency medical service employees.  The BFFA is the IAFF local union which represents Brownsville fire fighters and emergency medical services personnel.  Both the IAFF and BFFA exist for the purpose of bettering the hours, wages and other working conditions of the employees the unions seek to represent.  Where allowed by law, they accomplish these tasks by means of collective bargaining.  Where collective bargaining is prohibited, the unions accomplish this task by other legal means.

6.      After I had been successful in recruiting a number of BEMS employees to join the union, BFFA President Alfredo Christman approached Brownsville City Manager Carlos Rubenstein to request payroll dues deductions for BEMS members of the union.  In this regard, the City makes payroll deductions of union dues for Brownsville fire fighters, and payroll deductions are allowed for other employees for several other reasons.  However, Mr. Rubenstein declined Mr. Christman's request for payroll dues deductions for Brownsville EMS employees.

7.      In June 1997, Mr. Christman approached me and asked if BEMS employees could be on hand at the BFFA's annual picnic to provide first aid in case of an emergency, since

2

many of the new BEMS members would be attending the picnic anyway. I agreed to solicit other BEMS members to provide this service.

8.    In June 1999, as part of the ongoing union organizing drive, I published the "EMS Dispatch", the first and only union newsletter for BEMS employees. A true and correct copy of the newsletter is Exhibit 5 to the deposition of Arturo Rodriguez taken in this case. The newsletter notified BEMS employees that Mr. Rubenstein had declined to extend payroll dues deductions to the BFFA's BEMS members. It also notified employees of the BFFA's annual picnic and alerted them that we might set up a "first aid" station at the picnic since a few people had fainted from the heat at the picnic a year earlier. The newsletter identified me as a person to whom dues could be paid, and it twice identified me as the person to whom comments or letters could be directed concerning the newsletter.

9.    I printed up multiple copies of the "EMS Dispatch" and distributed them to as many BEMS employees as possible. I myself hand delivered many copies of the Dispatch to some employees and left copies at each of the stations. At one point, Supervisor Sam Ortega approached me while I was handing out EMS Dispatches to other employees. I asked Sam if Mr. Rodriguez had seen a copy of the newsletter. Mr. Ortega replied, "Yes, he's seen it, and he wasn't too happy about it." Within a few days after my conversation with Mr. Ortega, Mr. Rodriguez sent his June 18, 1997 memorandum to all EMS Department personnel. A true and correct copy of this memorandum is attached as Exhibit 6 to Mr. Rodriguez's deposition. The memorandum begins with the following sentence: "It has come to my attention that several members under the mistaken perception they belong to a union, have volunteered to provide medical services on June 29, 1997."

10.    After BEMS employees received Mr. Rodriguez's memorandum, the BFFA organizing drive was less effective. Employees began to express to me that they feared retaliation if they joined the BFFA. I also heard from various employees that Mr. Rodriguez had been overheard to say that he would not allow a union in BEMS. Nonetheless, I continued

3

through the Summer and early Fall of 1997 to persist in attempting to get employees to join the BFFA, although my efforts met with less success.

11.     On September 20, 1997, my partner, EMT Reynaldo Rosales, and I were dispatched to 700 Continental Drive in Brownsville. At the time we were dispatched, the only thing the dispatcher told us was that it was a 76-year-old man with "general weakness." We started in Unit 5 to answer the call.

12.     Mr. Rosales and I had some difficulty in finding the location to which we were dispatched. When we asked for a cross street on Continental Drive that we could use as a reference, the dispatcher, whose job it is to provide such information, gave us the wrong cross street. After that was straightened out, we found the location only to be confronted by several apartments all bearing the address 700 Continental Drive. The dispatcher had the woman making the call go outside and wave to us so that we would know the correct apartment.

13.     While we were still attempting to locate the caller's house, the woman who made the initial call contacted the dispatcher a couple more times. I now know from having listened to the Brownsville Police Department tape that during her second call to the dispatcher, she told the dispatcher the patient, who was her husband, was gagging and turning blue. However, this information was never relayed to Mr. Rosales and me at the time. Right before we arrived at the house where the patient was located, the dispatcher did tell us that the woman had advised her husband was not breathing at this time. However, the dispatcher provided no information about how long the patient had not been breathing. ·

14.     When I arrived at the location, I went upstairs in the apartment and found the patient, a 76-year-old man, lying on the bed. He was unconscious and unresponsive. His pupils were fixed and dilated. His skin was cool to the touch. He was not breathing and had no detectable pulse.

15.     We are taught in Paramedic training that when a patient is not breathing, the correct course of action is to determine first if the airway is obstructed. This patient had a good

deal of foam which prevented my seeing if there was an obstruction. Using a small portable unit called a V-Vac, I therefore suctioned the patient's mouth and determined that the airway was not in fact blocked. This was in accordance with BEMS standard operating procedure "CPR in Progress", which states, in pertinent part: "If no CPR is in progress upon arrival, crew members must decide whether CPR should be initiated, based on assessment and any pertinent information available on the scene." *See* Arturo Rodriguez Deposition Exhibit 18.

16.     Even before I suctioned the patient's mouth and determined that the airway was not blocked, it was obvious to me based on my assessment that the patient was dead. However, under BEMS standard operating procedure "Dead on Scene", the absence of vital signs does not automatically allow the Paramedic to assume the patient is dead. Rather, a patient may be considered on the scene if the "Dead on Scene" standard operating procedure is correctly applied. I immediately asked the patient's wife how long the patient had not been breathing. In the presence of both Mr. Rosales and me, the patient's wife replied that he stopped breathing before she called EMS the first time. I knew that had been well over 20 minutes. In accordance with the "Dead on Scene" SOP, a patient may be considered dead on the scene based on a documented down time of more than 20 minutes. I therefore documented the down time as reported by the patient's wife and proceeded through the remainder of the "Dead on Scene" SOP. I documented the absence of vital signs. I also did an EKG strip using all three leads to verify my own observation that the patient had no respiration, no pulse, and no blood pressure. I thereupon attempted to console the patient's wife while requesting through the dispatcher that Brownsville Police Department and the appropriate Justice of the Peace be notified. Mr. Rosales and I also remained on the premises until after a police officer arrived.

17.     Mr. Rodriguez, in my termination hearings and afterwards, questioned whether there was in fact a documented down time of more than 20 minutes. Again, I was not informed of information the patient' wife gave to the dispatcher while I was in route, except for the fact

5

that the patient was not breathing. When I arrived on the scene, the patient's wife told me and my partner the patient had not been breathing for well over 20 minutes.

18.     Mr. Rodriguez also complains that I should have checked the patient for lividity by rolling him over. The "Dead on Scene" standard operating procedure specifically states that when other factors are present which warrant considering the patient dead on the scene, the body "should not be disturbed or removed without authorization by appropriate authority unless movement is necessary to maintain traffic flow or prevent loss or destruction of the body." *See* Arturo Rodriguez Deposition Exhibit 19. Again, in my professional judgment this was not a close case. The patient clearly was dead. I saw no need to poke and prod more on the patient's body, thus potentially upsetting his wife even more than she already was.

19.     Mr. Rodriguez also contends that my actions in suctioning the patient's mouth constituted the initiation of treatment. This is simply untrue, as Mr. Rodriguez well knows. My purpose in suctioning the patient's mouth was not to treat the patient but to determine if there was an obstruction in the airway that might explain the fact that the patient was not breathing. Determining whether an obstruction is present is part of the assessment one needs to make in determining whether CPR should be initiated. At no point did I initiate treatment of the patient, and therefore application of the "Dead on Scene" protocol was appropriate and was performed by me to the letter. Ray Rosales, who observed everything that I did, at no point indicated that he disagreed with me in any way concerning the decisions I made. Mr. Rosales had an obligation to intervene if he thought my actions regarding the patient were inappropriate. However, neither Mr. Rosales nor the dispatcher who gave us faulty instructions, thereby delaying our arrival on the scene, was ever investigated or disciplined in any way.

20.     I have learned in discovery in this case that Training Director Brenda Leinweber supposedly wrote a memorandum to Mr. Rodriguez in connection with consideration of whether to terminate my employment in November 1997. I have reviewed that memorandum, which is Deposition Exhibit 2 to Mr. Rodriguez's deposition. I recall being counseled by Ms. Leinweber

6

with regards to the first five incidents listed in that memorandum, all of which occurred between December 1995 and February 1996, more than one and one half years prior to my termination. However, there are several other incidents listed in which it is claimed I made errors, and that Ms. Leinweber counseled or retrained me.  This is simply not true.  I did not receive any counseling or retraining with regards to the listed incidents after February 14, 1996.  Rather, I was asked to write a memo about the five incidents occurring before that date.  I did so and was told that I justified the actions taken in those five incidents in the memorandum.  The remaining incidents listed in this memorandum supposedly prepared by Ms. Leinweber (the memorandum is neither dated nor signed by Ms. Leinweber, who since has passed away) were not reviewed with me.

21.     I was terminated by Mr. Rodriguez on November 21, 1997, after pre-termination hearings held on October 15 and 29, 1997.  Documentation of the termination proceedings is found at Exhibits 15, 17, and 23 of Mr. Rodriguez's deposition.  BFFA President Alfredo Christman appeared at the October 15 meeting and tried to represent me, telling Mr. Rodriguez I was a BFFA member.  Mr. Rodriguez refused to allow Mr. Christman to represent me.

22.     My actions on the EMS run of September 29, 1997, are documented in the Ambulance Activity Report (Rodriguez Deposition Exhibit 9) and the Narrative Report (Rodriguez Deposition Exhibit 10) I prepared after completing the run.  The Standard Operating Procedures (SOPs) I followed in assessing the patient are "CPR in Progress" (Rodriguez Deposition Exhibit 18), and "Dead on Scene" (Rodriguez Deposition Exhibit 19).

23.     After Mr. Rodriguez investigated and terminated me, the union organizing effort effectively died.  Everyone I talked to was afraid to join because of what had happened to me. The organizing effort was dormant for more than a year until Justin Oakerson restarted it in early 1999.

I have read this affidavit, which consists of eight (8) pages including this page, and have

been given the opportunity to make any corrections. I have given this affidavit voluntarily and of

my free choice and, by my signature below, swear that it is true and correct.



Joel Ferrell

SWORN TO AND SUBSCRIBED before the undersigned notary public who states that on this ___7___ day of February, 2000 personally appeared before me JOEL FERRELL, who being by me duly sworn on his oath deposed and said that each and every statement in the foregoing affidavit is within his personal knowledge and is true and correct.

Linda Cantu
Notary Public, in and for the State of Texas

My commission expires: June 21 2002

LINDA CANTU
MY COMMISSION EXPIRES
June 21, 2002

8

CMPDF - www.texis.com

# EXHIBIT "G"

CutePDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOEL FERRELL | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 99 - 062 |
| CITY OF BROWNSVILLE, | § | |
| ARTURO RODRIGUEZ and | § | |
| CARLOS RUBINSTEIN | § | (JURY REQUESTED) |


| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| COUNTY OF CAMERON | § | |

## AFFIDAVIT OF J. ARNOLD AGUILAR

BEFORE ME, the undersigned official, on this day appeared J. Arnold Aguilar, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

My name is J. Arnold Aguilar and I am over 18 years of age. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

As the attorney for Defendants, City of Brownsville, Texas and Arturo Rodriguez in Civil Action No. B-99-062 in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the deposition of Carlos Rubinstein December 30, 1999, and state that the excerpts from the transcript of Carlos Rubinstein's deposition testimony attached to Defendants' First Amended Objection to Admission of Improper Character Evidence are true records of the testimony given by Carlos Rubinstein..

PAGE 1 OF 2

Further affiant sayeth not.

J. Arnold Aguilar

SUBSCRIBED AND SWORN TO BEFORE ME on the 16th day of November, 2000, to certify which witness my hand and official seal.



NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

My Commission Expires:

03/27/03

PAGE 2 OF 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOEL FERRELL                    X
                                X
VS.                             X
                                X   CASE NO. B-99-062
CITY OF BROWNSVILLE,            X
ARTURO RODRIGUEZ, AND           X
CARLOS RUBINSTEIN               X

---

ORAL DEPOSITION OF
CARLOS RUBINSTEIN
DECEMBER 30, 1999

---

ORAL DEPOSITION OF CARLOS RUBINSTEIN, produced

as a witness duly sworn by me at the instance of the

PLAINTIFF, taken in the above styled and numbered cause

on DECEMBER 30, 1999, before SHELLEY STINGLEY,

Certified Shorthand Reporter No. 5725 in and for the

State of Texas, at the offices of J. Arnold Aguilar,

Artemis Square, Suite H-2, 1200 Central Boulevard,

Brownsville, Texas.



10:26  1      A.   That's correct.

10:26  2      Q.   And you would probably do that through the

10:26  3   human resources department?

10:26  4      A.   Or direct -- or direct communication with the

10:26  5   director.

10:26  6      Q.   So the first real substantive involvement you

10:26  7   had with the termination of Mr. Ferrell, then, was when

10:27  8   he appealed Mr. Rodriguez's decision to you?

10:27  9      A.   That's correct.

      10           (Rubinstein Exhibit No. 24 marked)

10:27 11      Q.   I'm handing you what's been labeled for

10:27 12   identification as Rubinstein Deposition Exhibit 24.

      13           (Off the record)

10:29 14      Q.   I ask you to look at that and tell me, do you

10:29 15   recognize it?

10:29 16      A.   Yes, I do.

10:29 17      Q.   Could you identify it for me, please?

10:29 18      A.   It is a request from Elia Cornejo-Lopez, an

10:29 19   attorney here in town, on behalf of Mr. Ferrell

10:29 20   appealing the decision to terminate him, and it also

10:29 21   states that she'll be on vacation and she'll be

10:29 22   available after a certain date to proceed with the

10:29 23   appeal.

10:29 24      Q.   Okay.  And what -- in appeals of this nature,

10:29 25   what is the procedure that is utilized, generally?

10:30  1    A.   Generally, what is -- what takes place is I

10:30  2  receive the appeal, and they have to be within X number

10:30  3  of days of the decision -- of the adverse decision as

10:30  4  defined by the employee.  I can receive the request for

10:30  5  an appeal either directly from the employee in writing

10:30  6  or through human resources or as it occurred in this

10:30  7  matter.  The normal process would be, then, to order my

10:30  8  office to review the documents that exist relative to

10:30  9  the decision that's been made and to schedule the

10:30 10  hearing.

10:30 11    Q.   And what takes place at the hearing itself?

10:30 12    A.   At the hearing, it is more of an opportunity

10:30 13  for the employee to tell me why the decision is unfair

10:30 14  or why I should reverse it, reconsider it, issues like

10:30 15  that.

10:30 16    Q.   And, prior to the hearing, is the employee

10:31 17  given access to all of the evidence that you're

10:31 18  considering in making your decision on the termination

10:31 19  appeal?

10:31 20    A.   The employee has access to his personnel file

10:31 21  all the time, and the information that I gather comes

10:31 22  from there.

10:31 23    Q.   Okay.

10:31 24    A.   So I would say yes, he should have access to

10:31 25  the information.

11:00 1    your decision?

11:00 2         A.   Yes.

11:00 3         Q.   Okay.  Would that have changed your decision?

11:00 4         A.   I don't know if that would have changed my

11:00 5    decision.  I certainly would have explored it to make

11:00 6    sure that that was not a driving motive, absolutely.

11:00 7         Q.   Okay.

      8                   (Rubinstein Exhibit No. 25 marked)

11:00 9         Q.   I'm handing you what has been labeled for

11:00 10   deposition purposes as Deposition Exhibit 25.

11:00 11        A.   Yes.

11:00 12        Q.   Do you recognize this document?

11:01 13        A.   Yes, I do.

11:01 14        Q.   Could you identify it for me, please?

11:01 15        A.   It is the letter that is written or was written

11:01 16   to Ms. Lopez.  I believe I actually wrote this letter.

11:01 17                   And I'll explain that.  Sometimes they are

11:01 18   written by human resources.  Sometimes I write them

11:01 19   myself, depending on the workload.  But it basically

11:01 20   communicates my decision on the appeal, and the

11:01 21   decision that is documented here is to uphold the

11:01 22   decision to terminate Mr. Joel -- Mr. Ferrell.

11:01 23        Q.   And the letter is dated December 11, 1997.  Is

11:01 24   that approximately the date that you sent this letter

11:01 25   to Mr. Ferrell?

                        BRYANT & STINGLEY, INC.
          McAllen          Harlingen          Brownsville
        (956)618-2366    (956)428-0755      (956)542-1020

11:01 1    A.   It should be.

11:01 2    Q.   Okay.  And it indicates that the hearing that

11:01 3  we talked about previously occurred on December 8th of

11:01 4  1997.  Do you think that's accurate, as well?

11:01 5    A.   Yes, I do.

11:01 6    Q.   So you made -- or you informed Mr. Ferrell of

11:01 7  your decision to uphold the termination approximately

11:01 8  three days after his hearing?

11:01 9    A.   It's communicated to him three days later,

11:02 10  uh-huh.

11:02 11    Q.   And in that time -- at some point during that

11:02 12  process, you received from Mr. Rodriguez that

11:02 13  memorandum concerning why he terminated Mr. Ferrell?

11:02 14    A.   That's correct.

11:02 15    Q.   And you don't recall whether or not you ever

11:02 16  shared that information with Mr. Ferrell or gave him an

11:02 17  opportunity to rebut that information?

11:02 18    A.   I don't know whether he ever reviewed that

11:02 19  information.

11:02 20    Q.   Okay.  And Mr. Ferrell, of course, denied in

11:02 21  this hearing review that he had, in fact, initiated

11:02 22  treatment, didn't he?

11:02 23    A.   Yeah, that was his position.

11:02 24    Q.   Okay.  Just based on your own training and the

11:02 25  facts that you had at your disposal, you didn't agree?

70

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION

3     JOEL FERRELL                    X
                                      X
4     VS.                             X
                                      X    CASE NO. B-99-062
5     CITY OF BROWNSVILLE,            X
      ARTURO RODRIGUEZ, AND           X
6     CARLOS RUBINSTEIN               X

7                    REPORTER'S CERTIFICATE
8
                    I, SHELLEY STINGLEY, Certified Court
9     Reporter, certify that the witness, CARLOS RUBINSTEIN,
      was duly sworn by me, and that the deposition is a true
10    and correct record of the testimony given by the
      witness on DECEMBER 30, 1999; that the deposition was
11    reported by me in stenograph and was subsequently
      transcribed under my supervision.
12
                    I FURTHER CERTIFY that I am not a
13    relative, employee, attorney or counsel of any of the
      parties, nor a relative or employee of such attorney or
14    counsel, nor am I financially interested in the action.

15                  WITNESS MY HAND on this the 14th day of
      January              , 2000.
16

17                        Shelley Stingley
                          SHELLEY STINGLEY, CSR NO. 5725
18                        Expiration Date: 12-31-00
                          Bryant & Stingley, Inc.
19                        2010 East Harrison
                          Harlingen, Texas  78550
20

21

22

23

24

25
```

# EXHIBIT "H"

CVisPDF – www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOEL FERRELL,                          §
                                       §
            Plaintiff,                 §
                                       §
v.                                     §
                                       §        CA No. B-99-062
CITY OF BROWNSVILLE,                   §
ARTURO RODRIGUEZ, and                  §
CARLOS RUBINSTEIN,                     §
                                       §
            Defendants.                §

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT CITY OF BROWNSVILLE'S
INTERROGATORIES AND REQUEST FOR PRODUCTION[1]

To:   City of Brownsville, Arturo Rodriguez, and Carlos Rubinstein, by and through their
      attorney of record, J. Arnold Aguilar, LAW OFFICE OF J. ARNOLD AGUILAR, Artemis
      Square, Suite H-2, 1200 Central Blvd., Brownsville TX 78520

      Now comes Joel Ferrell, Plaintiff in the above-styled and numbered action, and provides

the below-listed objections and responses to Defendant's Interrogatories and Request for

Production to Plaintiff Joel Ferrell.

INTERROGATORY NO. 1:

      Please identify yourself by stating your full name, any other names you have ever used
during your lifetime (including nicknames, and/or aliases), your current address and any other
addresses where you have lived for the past five (5) years, including the number, street, city,
and state; your date and place of birth, your social security number, the name and last known
address of each person, if any, to whom you have been married, either ceremonially or
otherwise, and the name, address, and telephone number of anyone assisting you in answering
these Interrogatories.

---

[1] This pleading provides amended answers to "Defendant's Interrogatories and Request for Production to Plaintiff
Joel Ferrell" served on Plaintiff by Defendants Arturo Rodriguez and Carlos Rubinstein on or about August 5, 1999.
The Amended Answers supplement those provided in "Plaintiff's Reply and Responses to Defendants' Interrogatories
and Request for Production previously served on the aforementioned Defendants' attorney on or about September
20, 1999. This pleading also provides original responses to "Defendant's Interrogatories and Request for Production
to Plaintiff Joel Ferrell" served upon Plaintiff by Defendant City of Brownsville on or about June 12, 2000.

## ANSWER:

Joel Raymond Ferrell
Current address:
3815 Parkdale Dr., #323
San Antonio, TX 78229
(210) 885-1180

Prior addresses:

1034 South Mark Circle
Harlingen TX  78550
956/425-1963

P.O. Box 74
LaFeria, TX  78559
210/425-2192

325 E. Grimes, Apt. 4
Harlingen, TX  78550

1719 Laurie Lane, Apt. 4
Harlingen, TX  78550
512/507-8375

Rt 5 BOX 210B
Harlingen TX  78550

DOB:  01/20/65
Place of birth:  Austin, Texas
SS#:    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

Dana Lynne Pierce Ferrell
395 Other Place Dr.
New Braunfels, TX  78130
830/620-4326 (hm)
830/625-5114 (wk)

Norma Reynoso Ferrell
252 Viking Lane Apt. A
Brownsville TX  78520
956/550-0898

2

## INTERROGATORY NO. 2:

Identify each and every person that you intend to call as an expert witness in this cause and each and every expert that you do not intend to call as an expert witness in this cause, but whose work, opinions, or impressions have been reviewed by a testifying expert, indicating the area of expertise of each, and briefly specifying the substance of their anticipated testimony, if applicable.

## ANSWER:

B. Craig Deats
327 Congress Ave., Suite 300
Austin TX  78701
512/474-6200

Miguel Saldaña
Carinhas & Saldaña, L.L.P.
302 Kings Highway, Suite 109
Brownsville, Texas 78521
956/542-9161

Either of the above attorneys may testify concerning Plaintiff's attorney fees and costs at trial and in any appeals.  They are expected to testify that the time spent in preparing for and presenting Plaintiff's case at trial, and in any appeals, was reasonable and necessary in light of the facts of the case.  They will also testify that $225.00 per hour for attorneys and $75.00 per hour for their legal assistants is a reasonable rate in the Brownsville Division for attorneys with their skill and experience in this area of law.

Joel Raymond Ferrell
3815 Parkdale Dr., #323
San Antonio, TX 78229
(210) 885-1180

Justin Oakerson
37 Meadow Glenn Dr.
Brownsville, TX 78520
(956) 550-5538

Both of the above referenced persons are licensed paramedics and paramedic instructors who have taught at the college level.  Both are thoroughly knowledgeable concerning the medical protocols and standard operating procedures in effect in Brownsville EMS in September 1997.  Both will testify that Joel Ferrell's actions on the September 20, 1997, EMS run were correct and in accordance with Brownsville EMS standard operating procedures and medical protocols.   Both are expected to testify that Mr. Ferrell did not engage in any misconduct in his handling of the run in question.

3

## INTERROGATORY NO. 3:

Identify each statement, whether oral, written, or otherwise, which you contend constitutes speech for which you believe you were terminated and explain how each such statement touched on a.matter of public concern.

## OBJECTION:

Plaintiff objects to this interrogatory as being overly broad and unduly burdensome. Plaintiff cannot possibly be expected to remember and recite every statement he has made falling within this interrogatory. This information is more properly sought by taking Plaintiff's deposition. Subject to and without waiving this objection, Plaintiff responds as follows:

## ANSWER:

In early 1997, a group of Brownsville EMS personnel, including Plaintiff, approached the Brownsville Professional Fire Fighters Association (the Association) to request that it organize the Brownsville EMS employees. In February of 1997, the Association's Fire Fighter membership voted to organize the Brownsville EMS employees, and Plaintiff immediately began to actively, verbally solicit EMS employees for membership association. He also collected dues from the EMS employees who joined the Association. Plaintiff continued to actively and verbally solicit EMS employees for membership throughout the following months, and he made many statements touting the benefits of the union and explaining why all EMS personnel should be members of the union. In June of 1997 Plaintiff published a newsletter entitled "EMS Dispatch", the purpose of which was to report on the Association's efforts to organize EMS employees. The newsletter identified Plaintiff by name as the person to contact with questions about the organizational effort. The newsletter also criticized Defendant Rubinstein's decision to disallow payroll dues deductions. Plaintiff personally distributed the newsletters at various EMS stations. Later in June of 1997 Plaintiff openly and verbally volunteered to provide medical services at an annual Fourth of July picnic conducted by the Association. Plaintiff did this in order to provide further support for the Association, and he encouraged other EMS employees to do so. All of Plaintiff's verbal and written statements were in furtherance of union activity, more specifically his association with, and service to, the Brownsville Professional Fire Fighters Association.

By way of further response, Plaintiff incorporates herein by reference information in his deposition which is responsive to this request.

## INTERROGATORY NO. 4:

Please state completely and fully each and every basis for which you believe you were terminated on or about November 21, 1997, and state with particularity the facts leading up to your termination, and your understanding of the involvement of Defendants Rubinstein and Rodriguez in that termination. Please do not refer to Plaintiff's Original Petition.

## OBJECTION:

Plaintiff objects to this request because it is vague, overly broad and unduly burdensome. This information is more properly sought by taking Plaintiff's deposition. Subject to and without waiving this objection, Plaintiff provides the following answer.

## ANSWER:

Plaintiff believes he was fired in retaliation for organizing activity on behalf of the *Brownsville Professional Firefighters' Association*. From February 1997 until his termination, Plaintiff spearheaded the union organizing effort among Brownsville EMS personnel. This was common knowledge among Brownsville EMS personnel. In the months preceding Plaintiff's termination, Defendant Rodriguez made several statements indicating his opposition to unionization of Brownsville EMS. These included a statement to new employee Carlos Elizondo *to the effect that he could not work for Brownsville EMS and belong to the union; and a statement to* Reynaldo Gill and Fermin Cazares that there would never be a union in Brownsville EMS. He also attempted to dissuade Fermin Cazares from participating in the union. He told supervisor Sam Ortega that he was not happy seeing a union newsletter called the "EMS Dispatch". Although Plaintiff did nothing wrong on the September 20, 1997 EMS run, he was singled out and terminated. Defendant Rodriguez made the termination decision. Defendant Rubinstein sustained the termination in the absence of any demonstrated wrongdoing by Plaintiff. Other persons, *including Plaintiff's partner on the September 20 run, were not disciplined for engaging in identical conduct.*

By way of further response, Plaintiff incorporates herein by reference relevant information in his deposition and in the depositions of others, which is responsive to this request.

## INTERROGATORY NO. 5:

Describe with particularity the "group of Brownsville EMS personnel" who requested that the Brownsville Professional Fire Fighters Association organize the Brownsville EMS employees, as alleged in Paragraph 8 of your Original Petition, including the name, address, and telephone number(s) of each such individual.

## ANSWER:

Jaime Ibarra
5221 Wilderness Dr.
Brownsville TX  78521
956/546-6047

Claudio Gonzalez
954 East Madison
Brownsville TX  78520
956/541-9491

James Henson
City of Brownsville EMS
954 East Madison
Brownsville TX  78520
956/541-9491

Justin Oakerson
37 Meadow Glenn Dr.
Brownsville, TX  78520
956/550-5538

Juan Ituria
City of Brownsville EMS
954 East Madison
Brownsville TX  78520
956/541-9491

Brenda Leinwebber (Deceased)
City of Brownsville EMS

Veronica Atkinson
Iowa Gardens Rd.
San Benito, TX 78586
956/399-1272

Javier Quiroga
218 Cypress Loop
San Benito, TX  78586
956/361-1541

Curtis Roberson
10601 North 10th Street
Edinburg, TX  78539
956/318-1847

Mike Broadwater
956/585-5126
956/928-3595

Caesar Garcia "little Caesar"
City of Brownsville EMS
954 East Madison
Brownsville TX  78520
956/541-9491

Caesar Garcia "big Caesar"
1811 Fairway Circle
Mission TX  78572
956/778-0681
956/928-3594

Eliaf Gonzalez
1205 Guadalupe
Edinburg, TX  78539
956/316-4781

6

CUtePDF - www.fastio.com

Joe Martinez
5236 East 14th Street
Lot 80
Brownsville, TX  78520
956/831-5739

Claudio Ortiz
City of Brownsville EMS
954 East Madison
Brownsville TX  78520
956/541-9491

Rigoberto Bocenegra
City of Brownsville EMS
954 East Madison
Brownsville TX  78520
956/541-9491

Sam Ortega
City of Brownsville EMS
954 East Madison
Brownsville TX  78520
956/541-9491

Norma Reynoso
252 Viking Lane Apt. A
Brownsville TX  78520
956/550-0898

Reymundo Rosales
EMT, Driver
City of Brownsville EMS
954 East Madison
Brownsville TX  78520
956/541-9491

## INTERROGATORY NO. 6:

Describe with particularity the factual basis for your contention that there was no "proven wrongdoing" on your part as alleged in Paragraph 15 of Plaintiff's Original Petition.

## OBJECTION:

Plaintiff objects to this request because it is overly broad and unduly burdensome.  This information is more properly sought by taking Plaintiff's deposition.  Subject to and without waiving this objection, Plaintiff provides the following answer.

## ANSWER:

During the September 20, 1997 ambulance run about which Plaintiff was subsequently investigated and questioned by Defendant Rodriguez, Plaintiff followed the EMS protocols

7

CVAPDF - www.fasiso.com

which were in effect in every respect. Defendant Rodriguez terminated Plaintiff's employment for alleged failure to follow departmental protocol in making the decision not to initiate resuscitative efforts on the patient even though Plaintiff had fully complied with the departmental protocol which was in effect. Defendant Rubinstein upheld the termination decision despite the fact that Plaintiff had fully complied with the departmental protocol which was in effect.

By way of further response, Plaintiff incorporates herein by reference information in his deposition which is responsive to this request.

## INTERROGATORY NO. 7:

Please identify all photographs, motion pictures, video or audio recordings, maps, drawings, charts, diagrams, measurements, surveys or other such documents concerning the events and happenings made the basis of this lawsuit, either made before, at the time of, or after the time of events in question, that you, your attorney, or anyone acting in your or their behalf, have or know of.

## ANSWER:

The only audio recording known to Plaintiff is the tape of the EMS run in Defendants' possession, which has been requested from Defendant by Plaintiff in discovery. Other documents concerning the events and happenings made the basis of this lawsuit have been identified in Plaintiff's Initial Disclosures.

## INTERROGATORY NO. 8:

Identify each legal proceeding in which you have been or are now involved. This question is to be interpreted to include involvement in current and past **criminal** and **civil** matters wherein you have been a Plaintiff or Defendant, Petitioner or Respondent, complaining party or party against whom a complaint had been filed, as well as any and all arrests or warrants that have been issued against you. This also includes any involvement in civil or criminal actions, as well as worker's compensation proceedings. For each such proceeding, please state the date of the incident made the basis of the proceeding, the county, court, and cause number of each such proceeding, and the final disposition of each such proceeding.

## ANSWER:

With the exception of this lawsuit, Plaintiff previously has been involved in two divorce actions involved his two former wives, Dana Lynne Pierce Ferrell and Norma Reynoso Ferrell. Other than minor traffic tickets, Plaintiff was told to report to the Sheriff's Department in another county some years back concerning writing a check for which there were not sufficient funds. Plaintiff was charged and paid a fine, but was told he received Deferred Adjudication.

## INTERROGATORY NO. 9:

If you or your attorney are aware of the existence of any written or recorded statement made by or for or of any party or witness, please state:

8

(a)     The name of each person making the statement.

(b)     The date and substance of each statement.

(c)     The name, employer, occupation and last known address of the person or persons taking the statement, and if such person does not now have custody of the statement, the name and address of the person now in possession of the statement or a copy of it.

## OBJECTION:

Plaintiff objects to the extent that this request calls for Plaintiff to produce any written or recorded statement made by anyone other than the party Defendants.  Rule 26(b)(3) F.R.C.P. Subject to and without waiving this objection, Plaintiff responds as follows:

## ANSWER:

See documents referred to and provided to you under Section B of Plaintiff's Initial Disclosures in this case.  Plaintiff's attorney has received written statements in the form of Affidavits from Carlos Elizondo, Fermin Cazares, Justin Oakerson, and Joel Ferrell.  Plaintiff's attorney has taken depositions of several persons, including Sam Ortega, Bryan Chandler, Reynoldo Rosales, Arturo Rodriguez, and Carlos Rubinstein.

## INTERROGATORY NO. 10:

State the factual basis for your contention that Defendant Rodriguez is a "policy-making" officer, as alleged in Paragraph 17 of Plaintiff's Original Petition.

## OBJECTION:

Plaintiff objects to this request to the extent it seeks information from Plaintiff in the form of legal conclusions.  Subject to and without waiving this objection, Plaintiff provides the following response.

## ANSWER:

Defendant Rodriguez, as EMS Director, has total control over the City's policies with regard to hiring and firing of EMS employees.  No EMS employee is either hired or fired without Defendant Rodriguez' approval.  Defendant Rodriguez also is the official responsible for establishing personnel policies for Brownsville EMS.

Although Defendant Rodriguez' authority to fire EMS employees ostensibly is subject to an appeal to the City Manager, in fact no termination decision of Mr. Rodriguez has been overturned by the City Manager.  In the case of Plaintiff's termination appeal, the City Manager's actions were no more than a rubber stamp of a decision finally made by Defendant Rodriguez.

## INTERROGATORY NO. 11:

Describe with particularity the membership in the Brownsville EMS "Association," including the names, addresses and telephone numbers of the members solicited by you; the names, addresses, and telephone numbers of all current or former members; and the annual membership fees for 1997, 1998, and 1999. The association referred to in this Interrogatory means the Association identified by you in paragraphs 8 and 9 of your Original Petition. For purposes of description as to the need for this information for discovery purposes, this information is necessary to determine whether other Brownsville "Association" members have been promoted, demoted, or experienced any other favorable or adverse treatment in their employment, and to evaluate the effects of dues or fees on potential members' decisions to enroll, or not enroll, in the Association.

## OBJECTION:

Plaintiff objects to this request because it seeks information which is neither relevant or reasonably calculated to lead to the discovery of relevant evidence. Plaintiff further objects because the request is vague and the information sought cannot be easily ascertained. In this regard, there is no Brownsville EMS Association. The Brownsville Professional Firefighters Association is a union in which Brownsville EMS employees sought membership. Plaintiff further objects because providing the requested information concerning EMS membership in the Brownsville Professional Firefighters Association invades the privacy and first amendment associational rights of the membership of the Association. Subject to and without waiving these objections, Plaintiff provides the following response.

## ANSWER:

The two persons who spearheaded the organizational effort for Brownsville EMS employees were Joel Ferrell in 1997 and Justin Oakerson in 1999. Two other employees who assisted to a lesser extent in 1997 are Jaime Ibarra and Claudio Gonzalez. As to persons solicited by Plaintiff, Plaintiff solicited almost all of the persons listed in answer to Interrogatory No. 5.

## INTERROGATORY NO. 12:

Please identify all persons who have assisted in any manner with the establishment of, promotion of, recruitment for, or direction of the Brownsville EMS "Association," or who have in any manner contributed to the stewardship of the Brownsville EMS "Association," and briefly describe what each person identified has done to contribute to the organization of the "Association."

## ANSWER:

Plaintiff spearheaded the organizational effort in 1997. Two other employees who served as EMS stewards in 1997 were Jaime Ibarra and Claudio Gonzales.

10

Plaintiff did not keep up with the organizational efforts after his termination, but believes that Justin Oakerson spearheaded the renewed organizational efforts in 1999.

## INTERROGATORY NO. 13:

Describe with particularity your training and experience in emergency medical care, from 1992 to present, including but not limited to: any and all certifications or licenses held by you, training seminars or other related courses attended by you, and any certificates received by you.

## ANSWER:

Plaintiff's training and experience in Emergency Medical Care from 1992 to present are as follows:

| | |
|---|---|
| Certified Paramedic | 12/93 to 03/98 |
| Licensed Paramedic | 03/98 to Present |
| TDH Instructor | 12/93 to 03/00 |
| TDH Examiner | 12/93 to 03/00 |
| Critical Incident Stress Management Level 1 | 07/94 |
| Basic Trauma Life Support | 1993 and 02/97 |
| Pre Hospital Trauma Life Support | 08/99 to 08/02 |
| Advanced Cardiac Life Support | 1996 and 10/99 |
| Emergency Vehicle Operator Course | 09/1997 |
| Tactical Medic Course | 06/1997 |
| South Texas Community College | |
| Associate of Applied Science in Emergency Medical Sciences | 03/1998 |

## INTERROGATORY NO. 14:

For the period commencing five years before your termination herein to the present, state the name and address of each employer, rate of pay per hour, week or month, period of employment, and reason for leaving each employment; and provide a brief description of your job for each person for whom you have worked. If you were self-employed during this period, give the same information for the self-employment.

## ANSWER:

| | |
|---|---|
| Employer: | **City of Brownsville** |
| | P.O. Box 911 |
| | Brownsville, TX 78520 |
| Job title: | Sr. Paramedic |
| Dates of employment: | 06/1993 to 11/1997 |
| Rate of pay: | $8.03 p/hr. |
| Reason for leaving: | Terminated for union activities |

11

| Employer: | South Texas Community College |
|---|---|
| | P.O. Box 9701 |
| | McAllen, TX 78502 |
| Job title: | Part-time faculty |
| Dates of employment: | 08/1993 to 12/1999 |
| Rate of pay: | $18.00 p/hr. |
| Reason for leaving: | part-time |

| Employer: | City of Port Isabel EMS |
|---|---|
| | 201 Musina |
| | Port Isabel, TX 78256 |
| Job title: | Sr. Paramedic |
| Dates of employment: | 12/1993 to 12/1997 |
| Rate of pay: | $7.50 p/hr. |
| Reason for leaving: | Reduction in hours |

| Employer: | Advanced Cardiac and Trauma EMS |
|---|---|
| | RR 1, Box 484-B |
| | Weslaco, TX 78596 |
| Job title: | Sr. Paramedic |
| Date of employment: | 04/1998 to 03/1999 |
| Rate of pay: | $7.50 p/hr. |
| Reason for leaving: | part-time work |

| Employer: | Med-Care EMS |
|---|---|
| | P.O. Box 6767 |
| | McAllen, TX 78502 |
| Job title: | Sr. Paramedic |
| Dates of employment: | 06/1999 to 03/2000 |
| Rate of pay: | $8.49 p/hr. |
| Reason for leaving: | Employment with Lucent Technologies |

| Employer: | Lucent Technologies |
|---|---|
| | 2501-B Central Parkway, Suite B-1 |
| | Houston, TX 77092 |
| Job title: | Associate Communications Service Technician |
| Dates of employment: | 03/2000 to present |
| Rate of pay: | $9.92 p/hr. |
| Reason for leaving: | Currently employed |

## INTERROGATORY NO. 15:

Identify by name, address, and telephone number each potential employer with whom you have applied for work since January 1, 1997, including a brief description of the position applied for, rate of pay per hour, week or month, the name(s) of the person(s) with whom you spoke regarding the position, whether you were offered the position, whether you accepted the offer, and, if you refused, your reason(s) for doing so.

## ANSWER:

Plaintiff incorporates herein by reference responsive information provided during Plaintiff's deposition in this case.

## INTERROGATORY NO. 16:

Describe with particularity the acts attributable to Defendants which you allege have affected your earning capacity and explain how such acts have impacted your earning capacity and will continue to do so in the future.

## ANSWER:

Defendants' act which affected Plaintiff's earning capacity was the termination of his employment. Plaintiff suffered an immediate loss of income. In addition, the termination of his employment for alleged misconduct affected his ability to secure suitable alternative employment in the same field. Ultimately, Plaintiff had to abandon emergency medical care and seek employment elsewhere.

## INTERROGATORY NO. 17:

Please identify, by name and address, all physicians, surgeons, chiropractors, osteopaths, psychiatrists, psychologists, or other practicing members of the healing arts or hospitals, pharmacies or other institutions who rendered medical, surgical, or psychological treatment or furnished medicines, drugs or supplies to you for any inquiries, or pain, or mental anguish allegedly resulting from the occurrence made the basis of this lawsuit.

## ANSWER:        NAME            ADDRESS

N/A

## REQUEST FOR PRODUCTION NO. 1:

All documents, including all tangible reports, physical models, compilations of data, calculations, all factual observations, tests, supporting data, photographs and other materials in your possession, custody which have been prepared by or for any expert who may be called to testify as a witness on your behalf in this case, in anticipation of the expert's trial or deposition testimony, including any material prepared by a consulting expert if the consulting expert's opinions or impressions have been reviewed by a testifying expert. If any expert's factual observations, tests, supporting data, calculations, or opinions have not yet been reduced to tangible form, then Defendant hereby requests that they be recorded, reduced to tangible form, and provided to Defendant.

## RESPONSE:

Documents prepared and reviewed by Plaintiff's attorneys are their time and billing records. Records maintained to date will be provided in Exhibit A.

Neither Mr. Ferrell nor Mr. Oakerson has prepared any documents. Documents reviewed by them include all documents produced by either party in discovery which relate to the September 20, 1997 EMS run, together with Brownsville EMS Medical Protocols and Standard Operating Procedures in effect at the time.

## REQUEST FOR PRODUCTION NO. 2:

Please produce any and all documents evidencing your claims for damages.

## OBJECTION:

Plaintiff objects because this request is overbroad and fails to describe the items, or category of items requested, with reasonable particularity as required by Rule 34(b), F.R.C.P. Subject to and without waiving this objection, Plaintiff responds as follows:

## RESPONSE:

Documents responsive to this request will be provided in Exhibit B.

## REQUEST FOR PRODUCTION NO. 3:

Please produce any and all documents evidencing or embodying the speech for which you believe you were terminated.

## RESPONSE:

See "EMS Dispatch" newsletter published in June of 1997 which has already been provided to you as part of Plaintiff's Initial Disclosures in this case.

## REQUEST FOR PRODUCTION NO. 4:

Please produce any and all documents evidencing your response to Interrogatory No. 4.

## OBJECTION:

Plaintiff objects to this request because it is overbroad and fails to describe the items, or category of items requested, with reasonable particularity as required by Rule 34(b) F.R.C.P. Subject to and without waiving this objection, Plaintiff responds as follows.

## RESPONSE:

All documents provided by either party in discovery, except those documents pertaining to damages and attorneys fees, potentially are responsive to this request.

14

## REQUEST FOR PRODUCTION NO. 5:

Please produce any and all documents evidencing the alleged organization of the Brownsville EMS employees into a union.

## RESPONSE:

Please see the documents provided to you under Section B of Plaintiff's Initial Disclosures. See also documents which you have produced, or should produce, to Plaintiff pursuant to the Disclosure rules and/or in response to Plaintiff's Request for Production to you.

## REQUEST FOR PRODUCTION NO. 6:

Please furnish a copy or supply a time and place for this party to view a copy, or both, each photograph, motion picture, video or audio recording, map, drawing, chart, diagram, measurement, survey, or other such documents concerning the events and happenings made the basis of this lawsuit, either made before, at the time of, or after the time of events in question, that you, your attorney, or anyone acting in your or their behalf, have or know of.

## RESPONSE:

All documents identified in response to Interrogatory Number 7 are either in Defendants' possession or were provided with Plaintiff's Initial Disclosures.

## REQUEST FOR PRODUCTION NO. 7:

Please produce any and all documents signed by you or filed on your behalf in any civil or criminal proceeding identified by you in response to Interrogatory No. 8, including but not limited to any pleading, plea, verdict, order, or decree.

## OBJECTION:

Plaintiff objects because this request is overbroad and fails to describe the items, or category of items requested, with reasonable particularity as required by Rule 34(b), F.R.C.P. Subject to and without waiving this objection, Plaintiff responds as follows:

## RESPONSE:

Plaintiff has no responsive documents.

## REQUEST FOR PRODUCTION NO. 8:

Please produce each and every written or recorded statements made by or for or by any party or witness.

## OBJECTION:

Plaintiff objects to the extent that this request calls for Plaintiff to produce any written or recorded statement made by anyone other than the party Defendants.  Rule 26(b)(3) F.R.C.P. Subject to and without waiving this objection, Plaintiff responds as follows:

## RESPONSE:

See documents referred to and provided to you under Section B of Plaintiff's Initial Disclosures in this case.

Plaintiff is withholding from discovery written statements protected from disclosure under Rule 26(b)(3) F.R.C.P.

## REQUEST FOR PRODUCTION NO. 9:

Please produce any and all documents evidencing your response to Interrogatory No. 6.

## RESPONSE:

Please see the documents provided to you under Section B of Plaintiff's Initial Disclosures.  See also documents which you have produced, or should produce, to Plaintiff pursuant to the Disclosure rules and/or in response to Plaintiff's Request for Production to you.

## REQUEST FOR PRODUCTION NO. 9:

Please produce a copy of any written report prepared by an expert witness designated by you or any expert whose opinions or impressions have been reviewed by a testifying expert.

## RESPONSE:

Plaintiff's experts have not prepared any written reports.

## REQUEST FOR PRODUCTION NO. 10:

Please produce a copy of the resume or curriculum vitae of each expert witness designated by you in response to Interrogatory number 2.

## RESPONSE:

Responsive documents have been or will be provided in Exhibit A.

## REQUEST FOR PRODUCTION NO. 11:

Please produce a copy of all documents reviewed by each expert witness designated by you.

16

**RESPONSE:**

Documents prepared and reviewed by Plaintiff's attorneys are their time and billing records.  Records maintained to date will be provided in Exhibit A.

Neither Mr. Ferrell nor Mr. Oakerson has prepared any documents.  Documents reviewed by them include all documents produced by either party in discovery which relate to the September 20, 1997, EMS run, together with Brownsville EMS Medical Protocol and Standard Operating Procedures in effect at the time.

**REQUEST FOR PRODUCTION NO. 12:**

Please produce any and all communications between you or your attorneys or anyone else acting on your behalf, and any expert with respect to whom you cannot positively state that he or she will not testify in this case, and that his or her opinions or impressions have not even been reviewed by an expert whom may be called as a witness.

**RESPONSE:**

n/a

**REQUEST FOR PRODUCTION NO. 13:**

Please produce any and all documents and tangible things that have been made or prepared for any expert in anticipation of the expert's trial and/or deposition testimony.

**RESPONSE:**

Documents prepared and reviewed by Plaintiff's attorneys are their time and billing records.  Records maintained to date will be provided in Exhibit A.

Neither Mr. Ferrell nor Mr. Oakerson has prepared any documents.  Documents reviewed by them include all documents produced by either party in discovery which relate to the September 20, 1997, EMS run, together with Brownsville EMS Medical Protocol and Standard Operating Procedures in effect at the time.

**REQUEST FOR PRODUCTION NO. 14:**

Please produce all documents, reports, or tangible things that have been prepared, in whole or in part, by any expert who may be called to testify in this case, or whose opinions or impressions have been reviewed by an expert who may be called to testify.  Your response should include, but not be limited to, all work papers, notes, documents, or data base of any expert.

**RESPONSE:**

Documents prepared and reviewed by Plaintiff's attorneys are their time and billing records.  Records maintained to date will be provided in Exhibit A.

Mr. Ferrell and Mr. Oakerson have not prepared any documents, reports, or tangible things other than the run and activity reports prepared by Mr. Ferrell at the time of the September 20, 1997 EMS run.

**REQUEST FOR PRODUCTION NO. 15:**

Please produce any and all treatises, books, publications, periodicals, pamphlets or reports which you or any expert who you may call to testify in this case may rely upon or recognize as a reliable authority.

**RESPONSE:**

n/a

**REQUEST FOR PRODUCTION NO. 16:**

Please produce any exhibits which may be used as a summary of or support for the opinions of any expert witness designated by you or in response to Interrogatory No. 2.

**RESPONSE:**

Documents prepared and reviewed by Plaintiff's attorneys are their time and billing records.  Records maintained to date will be provided in Exhibit A.

**REQUEST FOR PRODUCTION NO. 15:[2]**

Please provide any and all documents evidencing the information requested in Interrogatory No. 8.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:[2]**

Please produce any and all documents evidencing your contention that Defendant Rodriguez is a "policy-making" officer.

---

[2] These two Requests for Production from the Interrogatories and Request for Production of Documents submitted by Defendant City of Brownsville overlap with prior document requests 15 and 16 made by Defendants Rodriguez and Rubinstein.

18

RESPONSE:

Documents evidencing Plaintiff's contention are among those provided to Plaintiff by Defendants in discovery, including the organizational charts, personnel policies, standard operating procedures and medical protocols.

## REQUEST FOR PRODUCTION NO. 17:

Please produce any and all documents evidencing Brownsville EMS personnel membership in the Professional Fire Fighters Association, including documents evidencing names, addresses, and telephone numbers of members from 1997 to the present and documents evidencing the annual membership fees for 1997, 1998, and 1999.

## OBJECTION:

Plaintiff objects to this request because it seeks information which is neither relevant or reasonably calculated to lead to the discovery of relevant evidence. Plaintiff further objects because the request is vague and the information sought cannot be easily ascertained. Plaintiff further objects because providing the requested information concerning EMS membership in the Brownsville Professional Firefighters Association invades the privacy and first amendment associational rights of the membership of the Association. Subject to and without waiving these objections, Plaintiff provides the following response.

RESPONSE:

Plaintiff has no responsive documents.

## REQUEST FOR PRODUCTION NO. 18:

Please produce any and all documents evidencing your response to Interrogatory No. 3.

RESPONSE:

Documents responsive to this request will be provided in Exhibit A.

## REQUEST FOR PRODUCTION NO. 19:

Please produce all of your personnel files from each employer identified by you in response to Interrogatory No. 14, or in the alternative, sign the enclosed employment records authorization form.

RESPONSE:

The requested employment records authorization form is attached hereto.

## REQUEST FOR PRODUCTION NO. 20:

Please produce any and all documents evidencing the information requested in Interrogatory No. 15.

## RESPONSE:

Plaintiff has no responsive documents.

## REQUEST FOR PRODUCTION NO. 21:

Please produce any and all documents evidencing the information requested in Interrogatory No. 16.

## RESPONSE:

Plaintiff has no responsive documents.

## REQUEST FOR PRODUCTION NO. 22:

Produce any and all written or other documentation reflecting all factual observations, tests, supporting data, calculations, photographs, and opinions of each person or entity identified by your in response to Interrogatory No. 17, reflecting your alleged injuries herein, and sign the attached medical authorization.

## RESPONSE:

Documents prepared and reviewed by Plaintiff's attorneys are their time and billing records. Records maintained to date will be provided in Exhibit A.

Neither Mr. Ferrell nor Mr. Oakerson has prepared any documents. Documents reviewed by them include all documents produced by either party in discovery which relate to the September 20, 1997, EMS run, together with Brownsville EMS Medical Protocol and Standard Operating Procedures in effect at the time.

Respectfully submitted,

DEATS & LEVY, P.C.

B. Craig Deats
TBN: 05703700
327 Congress Ave., Suite 300
Austin, Texas 78701
(512) 474-6200
FAX (512) 474-7896

20

CVISPDF - www.fexiia.com

CARINHAS & SALDAÑA, L.L.P.
Miguel A. Saldaña
TBN: 17529450
Corporate Plaza, Suite 109
302 Kings Highway
Brownsville, Texas 78521
(956) 542-9161
FAX (956) 542-3651

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served on counsel for Defendants, J. Arnold Aguilar, LAW OFFICE OF J. ARNOLD AGUILAR, Artemis Square, Suite H-2, 1200 Central Blvd., Brownsville, Texas 78520, FAX (956) 504-1408, by certified mail, return receipt requested, on this the 24th day of July , 2000.

B. Craig Deats

21

STATE OF TEXAS           §

                                     §

COUNTY OF CAMERON      §

## VERIFICATION

        BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared **JOEL FERRELL**, who being by me duly sworn on his oath deposed and said that he is duly qualified and authorized in all respects to make this affidavit; that he has read the above and foregoing answers to Interrogatories; that every statement contained in the answers is within his knowledge and true and correct.


                                             _____

                                             JOEL FERRELL

        SUBSCRIBED AND SWORN TO BEFORE ME by the said **JOEL FERRELL** on this the ____7TH____ day of June, 2000, to certify which witness my hand and official seal.

SCOTT CHILDRESS
NOTARY PUBLIC
State of Texas
Comm. Exp. 12-10-2003

                                             _____

                                             Notary Public
                                             In and For the State of Texas


                                             My Commission Expires: *12/10/2003*


                                             _____

## AUTHORIZATION TO ANY EMPLOYER

I do hereby authorize any employer, past or present, or any other person with relevant information, to disclose and furnish to:

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas   78520
Telephone:  (956) 504-1100
Facsimile:  (956) 504-1408

any and all information and/or records concerning the past or present employment, including earnings, job descriptions, duties, injuries, illnesses, and/or absences of **JOEL FERRELL**.  I further authorize that a photostatic copy of this authorization shall be considered as effective and valid as the original.

Signed the _____5_____ day of _____July_____, 2000.

_____
JOEL FERRELL

Pertinent information:

Address:   3815 Parkdale Dr. Apt. 323

San Antonio, TX - 78229

D/O/B:   20 Jan. 1965

S.S. No.:   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